1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF GEORGIA
2                 SAVANNAH DIVISION

3

4    UNITED STATES OF AMERICA,     :
                                   :
5       v.                         :
                                   :   CASE NUMBER CR-4:20-00082
6    DARRYL KINLOCH,               :
                                   :
7          Defendant.              :
     _____

8

9

10

11

12

13            <u>MOTION TO SUPPRESS HEARING</u>
                (VIA VIDEOCONFERENCE)

14       BEFORE THE HONORABLE CHRISTOPHER L. RAY
              United States Courthouse
15                 125 Bull Street
                  Savannah, Georgia
16                January 11, 2021

17

18

19

20

21

22    _____

23   COURT REPORTER:  Victoria L. Root, CCR (appearing remotely)
                      United States Court Reporter
24                    Post Office Box 10552
                      Savannah, Georgia  31412
25                    (912) 650-4066

Proceedings taken down by mechanical stenography.
Transcript produced by computer-aided transcription.

2

1                     A P P E A R A N C E S

2


3    FOR THE GOVERNMENT:

4        MARCELA C. MATEO, Esquire
         Assistant United States Attorney
5        22 Barnard Street, Suite 300
         Savannah, Georgia  31412
6        (912) 652-4422

7


8    FOR THE DEFENDANT:

9        STEVEN WOODWARD, Esquire
         7 East Congress Street, Suite 720
10       Savannah, Georgia  31401
         (720) 208-6055
11

12   NOTE:  Defendant appearing via videoconference from the
            Chatham County Detention Center
13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                           I N D E X

2


3    WITNESS FOR THE GOVERNMENT                          PAGE

4         1. DEVIN O'NEILL
               Direct Examination by Ms. Mateo. . . . . .    8
5              Cross-Examination by Mr. Woodward. . . . .   24
               Redirect Examination by Ms. Mateo. . . . .   56
6              Recross-Examination by Mr. Woodward. . . .   65

7

8    CERTIFICATE OF REPORTER. . . . . . . . . . . . . .   86

9

10

11

12                            -  -  -

13

14

15

16

17                      E X H I B I T S

18    GOVERNMENT'S
      EXHIBIT NUMBER          IDENTIFIED      TENDERED      ADMITTED
19         1                      37             37           37

20         2                      37             37           37

21

22

23

24

25

4

1              P R O C E E D I N G S

2        (Proceedings called to order at 10:22 a.m.)

3        (An off-the-record discussion was held.)

4              THE COURT:  All right.  Let's go ahead,

5    Ms. Davenport, if we could, and call the case, please.

6              COURT CLERK:  4:20-CR-00082, <u>United States of</u>

7    <u>America v. Darryl Kinloch.</u>

8              MS. MATEO:  Good morning, Your Honor.  Assistant

9    United States Attorney Marcela Mateo on behalf of the

10   Government, and we're ready to proceed today.

11             MR. WOODWARD:  Good morning, Your Honor.

12   Steven Woodward on behalf of Mr. Kinloch.  We're ready to

13   proceed.

14             THE COURT:  All right.  Mr. Kinloch, are you able to

15   hear the folks who are speaking in the background?  You're at

16   a -- they're at a significant distance from the microphone.

17             THE DEFENDANT:  Yes, sir, Your Honor.  A little bit,

18   sir, yes, sir.

19             THE COURT:  All right.  Ms. Root, our court reporter,

20   are you able to hear counsel?

21             THE COURT REPORTER:  No, sir.  Barely.

22             THE COURT:  All right.  Okay.  We only have one

23   microphone for the video link, and it is here present.  The

24   only thing I can think to do with respect to that is to invite

25   counsel, during the pendency of this hearing, to come up a

1    little closer than you ordinarily would and present any

2    statements or arguments probably in the vicinity of the podium

3    but maybe even a little bit this side of the podium.  And speak

4    loudly, and we'll try and proceed from there.

5              To that end, if you would, Ms. Mateo, come on up

6    here.  Make your announcement again.  We'll see if Ms. Root's

7    able to hear you a little bit better.

8              MS. MATEO:  (Complied.)

9              THE COURT:  Try it from there, please.

10             MS. MATEO:  Good morning.  Assistant United States

11   Attorney Marcela Mateo on behalf of the Government, and we're

12   ready to proceed.

13             THE COURT:  Ms. Root, is that better?

14             THE COURT REPORTER:  Yes, sir, much better.

15             THE COURT:  All right.  Similarly, Defense Counsel,

16   if you'd come forward and make your announcement.

17             MR. WOODWARD:  Good morning, Your Honor.

18   Steven Woodward on behalf of Mr. Kinloch.  We're ready to

19   proceed.

20             THE COURT:  All right.  Thank you, Counsel.

21             We are simply going to have to go slowly today.  And,

22   Counsel, I'm going to have to ask you to come up and take that

23   position for each and every bit of presentation you're going to

24   make today.  I'm not quite sure how we're going to manage with

25   witnesses on cross and response, but we'll figure that out as

6

1    we go along.

2              We are here today for purposes of addressing two

3    motions.  The defendant has a pending motion to suppress filed

4    at Docket Entry Number 27.  The defendant also has a motion for

5    release on bond with conditions at Docket Entry Number 39.

6              I propose that we will take up the suppression motion

7    first today and then pivot to the motion for release on bond.

8    I would point out, Counsel, that I recognize that some of the

9    facts and circumstances of the arrest back in February of 2020

10   would likely bear on the question of release on bond, and so,

11   if you'd like to cover that in the sort of natural flow of the

12   facts during the suppression portion of your presentation, you

13   can develop that evidence there so we don't have to hear it

14   twice.

15             Mr. Woodward, I note that, at Docket Entry 48, the

16   defendant had initially indicated that he would consent to a

17   video hearing for purposes of the motion on release versus

18   detention but that he would not consent to a video hearing on

19   the suppression motion.

20             I have been subsequently informed that by conducting

21   the hearing portion of the evidence -- the evidence and the

22   argument and the witnesses in person here in the courtroom with

23   Mr. Kinloch listening on the video that that is acceptable to

24   him.

25             Is that correct?

1      MR. WOODWARD:  That is correct, Your Honor.

2      THE COURT:  All right.  So, Mr. Kinloch, just so we

3  are clear, I was informed that you wanted to have an in-person

4  hearing today on the question of your suppression motion.  Your

5  lawyer is present.  He will make his arguments in person today.

6      And you are willing to participate on the video link

7  by listening in; is that correct?

8      THE DEFENDANT:  Yes, sir.  Yes, sir, Your Honor.

9      THE COURT:  All right.  Thank you, Mr. Kinloch.

10      All right.  So to that end, let us turn our

11  attention, then, to the suppression motion.

12      Let me pause for a moment.

13      Ms. Root, we're going to have a recurring problem

14  today in terms of trying to secure questions and answers on

15  the witness testimony.  We will do our best.  But if you have

16  problems hearing either, again, please, interrupt us.

17      Ms. Mateo, we are here.  I will hear from the

18  Government first, please.

19      MS. MATEO:  Yes, Your Honor.  With that, the

20  Government would like to call Officer Devin O'Neill to the

21  stand.

22      THE COURT:  All right.  Very well.  Officer O'Neill,

23  if you'll come forward, please.

24      MS. MATEO:  Judge, would you like to maybe put a

25  chair right --

8

1          THE COURT:  Yes.

2          MS. MATEO:  -- in front?

3          THE COURT:  That's what we're going to do.

4          MS. MATEO:  Okay.

5          THE COURT:  Officer O'Neill, if you'll turn, raise

6   your right hand, and face the clerk, she'll administer you an

7   oath.

8       (The witness, Devin O'Neill, was sworn.)

9          COURT CLERK:  If you could state your name for the

10  record, please.

11         THE COURT:  Officer Devin O'Neill.

12         COURT CLERK:  Thank you.

13         THE COURT:  You may be seated.

14         Please speak loudly, both counsel and the witness.

15         THE WITNESS:  Yes, sir.

16         MS. MATEO:  Your Honor, may I proceed?

17         THE COURT:  Please, Ms. Mateo.

18                         DEVIN O'NEILL,

19  having been duly sworn, was examined and testified as follows:

20                      DIRECT EXAMINATION

21  BY MS. MATEO:

22  Q.   Officer O'Neill, who is your employer?

23  A.   The Savannah Police Department.

24  Q.   And how long have you been with the Savannah Police

25  Department?

9

1    A.    Approximately 2 and a half years.

2    Q.    And are you in any current unit at this time?

3    A.    I'm a detective with the Strategic Investigation Unit.

4    Q.    And how long have you been with SIU?

5    A.    Only about 3 months now.

6    Q.    And prior to being hired by Savannah Police Department,

7    did you do any training or education for your current position?

8    A.    I studied criminal justice at the University of Toledo.

9    I've got a bachelor's degree in that.

10   Q.    And could -- and you also completed the POST training --

11   A.    Correct.

12   Q.    -- to become a police officer?

13         Officer O'Neill, I want to direct your attention to

14   February 9th, 2020.

15         Were you working that day?

16   A.    Yes.

17   Q.    Let's talk a little bit about a traffic stop that

18   occurred.

19         Can you describe what you observed when it came to a red

20   vehicle, please.

21   A.    Yes.  I was at Jimmy DeLoach Parkway and Benton Boulevard.

22   I was actually sitting at the light.  And I observed a red

23   Camaro moving at a high pace of speed come from the wrong lane

24   of traffic -- it's a divided highway -- and come in front of my

25   vehicle at a high rate of speed across into the proper lane of

1    traffic at that point right at the light.

2        At that point, I turned off to catch up to the vehicle.

3    It was moving at a high rate of speed, so I didn't end up

4    catching up to the vehicle until, I believe, Jimmy DeLoach

5    Parkway and Crossroads Parkway, where I initiated the --

6             MR. WOODWARD:  Objection --

7    A.   -- traffic stop.

8             MR. WOODWARD:  -- Your Honor.  I'm just going to ask

9    that the officer refer to his memory rather than his report.

10            THE COURT:  Well, hold on.

11            Ms. Mateo, do you have any (indiscernible; audio

12   disruption)?

13            MS. MATEO:  No.

14            UNIDENTIFIED SPEAKER:  We lost --

15            MS. MATEO:  That's fine.

16            UNIDENTIFIED SPEAKER:  -- the jail.  We lost the

17   jail.

18            THE COURT:  All right.  We have lost Mr. Kinloch,

19   so we will just sit tight until that communication can be

20   restored.

21       (Pause in proceedings from 10:29 a.m. to 10:33 a.m.)

22            THE COURT:  All right.  Ms. Mateo, you can continue

23   your direct examination.

24   BY MS. MATEO:

25   Q.   And, Officer O'Neill, I see that you put your report away.

1    If at any point you don't remember anything, you can pull your

2    report to refresh your memory.  But at this point, if you'll

3    just testify (inaudible).

4              THE COURT:  And, again, please, loudly, folks.

5    BY MS. MATEO:

6    Q.    You testified that you saw this vehicle driving very

7    quickly and on the wrong side of traffic.

8          What violations, at that point, did that car commit?

9    A.    Driving on the wrong side of the road.  And at that

10   point, it had just, in that one -- and then as I followed it,

11   it committed more traffic infractions as well, too.

12   Q.    So did you pull it over for a traffic stop?

13   A.    Correct.

14   Q.    And what happened then?

15   A.    At that point, as I was coming out of my vehicle, I could

16   see through the back window of the vehicle that Mr. Kinloch was

17   digging through the vehicle, which heightened my senses greatly

18   because, from my training and experience, individuals tend to

19   try to conceal firearms or narcotics when they reach around in

20   the vehicle as you're walking and approaching.

21   Q.    And you mentioned -- you said "Mr. Kinloch."

22          Is that the individual driving the vehicle?

23   A.    Yes.

24   Q.    And you later identified him as Mr. Kinloch?

25   A.    Yes.

1   Q.   And I know this is a strange situation, but looking at the

2   screen, is that the individual that you pulled over that day on

3   February 9th, 2020?

4   A.   With the mask, it's a little hard, but I believe that to

5   be Mr. Kinloch.

6          MS. MATEO:   Your Honor, for purposes of

7   identification, would you like him to pull down his mask,

8   or can I make notice that, at this point, the witness has

9   identified the defendant?

10         THE COURT:   I'm willing to accept that

11   identification.

12         MS. MATEO:   Thank you, Your Honor.

13   BY MS. MATEO:

14   Q.   You stated that you observed Mr. Kinloch digging around in

15   the seat in the (indiscernible; audio disruption).

16        What, if anything, did you do next?

17   A.   At that point, I stayed at the rear of the vehicle --

18   that way, I was at a safer position -- and I gave loud verbal

19   commands to shut off the vehicle and to actually toss the keys

20   out of the window.

21   Q.   And when you say you stayed at the rear of the vehicle, is

22   this where the trunk is of the car?

23   A.   Correct.

24   Q.   Did you ever approach the window at that point?

25   A.   Not initially, no.

13

1    Q.    And when you said "verbal commands," what exactly did you

2    ask Mr. Kinloch to do?

3    A.    To shut off the vehicle.  And then I had him place the

4    keys out of the window, and I told him to toss them out the

5    window.

6    Q.    Why did you do that?

7    A.    Basically, at that point, with how he was acting and the

8    way he had been driving, I was kind of worried that he might

9    put the car into gear or something unsafe might happen, so I

10   just kind of wanted to make sure the vehicle was off and then

11   that the keys were out the window so nothing could happen from

12   there.

13   Q.    What, if anything, did you think he perhaps had violated

14   with what you observed in his driving?

15   A.    I thought, I mean, it was possible that he was under the

16   influence at that point because of multiple lane violations as

17   well as driving on the wrong side of the road at a high rate of

18   speed at that time of night.

19   Q.    Did he comply with those commands?

20   A.    He complied with that first command to shut off the

21   vehicle, but he did not comply with tossing the keys out of the

22   vehicle.  He just held them in his hand.

23   Q.    What happened next?

24   A.    I removed the keys from his hand, and then I addressed

25   Mr. Kinloch.

1    Q.   And, at that point, had you stepped back from the window,

2    or were you still around the window at that point?

3    A.   I was pretty close.  I was standing there, I believe,

4    right by the driver at that point just speaking to him and went

5    from there.

6    Q.   At any point, did you remove Mr. Kinloch from the vehicle?

7    A.   I did, yes.

8    Q.   And what did you do next?

9    A.   I patted Mr. Kinloch down for weapons just for safety due

10   to the fact that he was reaching around beforehand in the

11   vehicle.  I didn't know whether he had retrieved a weapon.  And

12   then, obviously, with just, like -- he -- when I started to ask

13   him initial questions, he wasn't very cooperative, like wasn't

14   giving me answers that were very direct, so . . .

15   Q.   And were you alone at this point?

16   A.   Officer Bishop had arrived on scene.

17   Q.   And what, if anything, did you observe as you pulled him

18   out of the vehicle as it relates to his behavior or speech?

19   A.   I could smell an odor of alcohol.  And like I said, he

20   wasn't very direct and just kind of seemed a little out of it.

21   Q.   Did he speak to you?

22   A.   He did.

23   Q.   Was his speech normal?

24   A.   No.  It was a little slurred.

25   Q.   What happened next?

1   A.   We brought him back.  Officer Bishop does standardized

2   field sobriety, so he took over that portion.

3   Q.   And at any point, did you hear anything over dispatch?

4   A.   A traffic BOLO was issued for Jimmy DeLoach Parkway of a

5   red sports car driving on the wrong side of the road.

6   Q.   You said a traffic -- what was issued?

7   A.   It's a traffic BOLO, be on the lookout for, basically, for

8   officer -- it's like an officer advisory.

9   Q.   And at that point, did you respond?

10  A.   Yeah.  I responded that I believed that vehicle to be the

11  vehicle I had stopped.

12  Q.   You had -- and Officer Bishop arrived, and he was

13  performing the sobriety test; is that correct?

14  A.   Yes.

15  Q.   What were you doing at this point?

16  A.   At that point, I just kind of held back.  I shut off the

17  lights on the vehicle, which is required for us to see.  So,

18  basically, it allows -- and so we can look at the eyes.  He

19  asked me to do that and then retrieve his phone.  But I just

20  kind of stood back a little and kind of observed some of it.

21  Q.   And when you said you turned off the lights of the

22  vehicle, which vehicle?

23  A.   Both vehicles, the front and -- the front lights.

24  Q.   Of your vehicle?

25  A.   Yes.  And I believe his as well, too.

1    Q.    Officer Bishop's?

2    A.    I believe so, yes.

3    Q.    And at some point, did Officer Bishop inform you he was

4    going to put the defendant under arrest?

5    A.    Yes.

6    Q.    For what?

7    A.    Driving under the influence.

8    Q.    And what proceeded to happen next?

9    A.    At that point, we had attempted to place him in handcuffs.

10   I felt Mr. Kinloch tighten up and tense, and then he kind of --

11   it was kind of like a -- it was like "No," and he just pulled

12   away from me and tried to rip away.  I tried to grab on to him.

13   I felt him kind of strike the side of my head.  I don't know if

14   it was, like, a closed or open fist.

15        We proceeded then to wrestle and fight.  We rolled

16   down and -- kind of like off the road into a ditch area.

17   Officer Bishop ended up deploying his Taser.  I don't know if

18   it was once or twice.  Mr. Kinloch continued to fight.

19        I was finally able to take his back and put him in a

20   seat belt position.  And at that point, I was able to kind of

21   direct Officer Bishop to grab his hand and put him in

22   handcuffs.  He was still actively resisting us.  And at that

23   point, we were finally able to get him into handcuffs.

24   Q.    You said that you felt something strike your head.

25        Was this Mr. Kinloch?

17

1    A.    Yes.

2    Q.    And you used the phrase "actively resisting."

3          Was this his behavior, or were you also giving him

4    commands at that point?

5    A.    I mean, we were giving him verbal commands.  He wasn't

6    responding at that point.

7              THE COURT REPORTER:  Can I ask a question quick?  I'm

8    sorry.

9              THE COURT:  Go right ahead, Ms. Root.

10             THE COURT REPORTER:  I was just wondering if we could

11   maybe have Mr. Kinloch's mic muted.  I can hear doors slamming

12   in the background.  And that might clear --

13             THE COURT:  Sure.  I can ask at the jail if it would

14   be possible to mute Mr. Kinloch's microphone.

15             All right.  It seems quieter, Ms. Root.  I think they

16   have muted it.

17             THE COURT REPORTER:  Yes, sir.  That's much better.

18   Thank you.

19             THE COURT:  Please proceed, Ms. Mateo.

20   BY MS. MATEO:

21   Q.    And, Officer O'Neill, do you remember the conditions of

22   the day?  Was it around what time?  Was it dark?

23   A.    I believe it was approximately around 9:45 in the evening.

24   It was dark.

25   Q.    And what was the weather, if you remember?

1  A.    I believe it was clear, a little cold.

2  Q.    After the defendant was put in handcuffs, what happened

3  next?

4  A.    At that point, we got him up to our patrol vehicle.  We

5  had trouble getting him in.  He didn't want to get in the car.

6  We actually had to pull him into the car from the other side to

7  get him in.  He was kicking his feet out to keep the doors

8  open.  But we were finally able to get him into the vehicle.

9  Q.    And what happened after he was put in the vehicle?

10 A.    Basically, some of the other officers kind of arrived on

11 scene.  We kind of took a minute to catch our breath.  I wasn't

12 feeling so well, so we took a minute to kind of, like, gather

13 our breath.  And, like I said, I had to throw up a couple

14 times.  I was pretty spent, so . . .

15 Q.    And, Officer O'Neill, you said that you had felt sick.

16       Had you felt sick earlier that day?

17 A.    Yeah.  I hadn't felt very well earlier that day, but this

18 just kind of put -- pushed it over the top, I guess.

19 Q.    And when you say "this," do you mean the traffic stop or

20 the tussle?

21 A.    The physical altercation.

22 Q.    And approximately, if you remember, Officer O'Neill, how

23 many minutes did it take you to recover from your sickness?

24 A.    The best approximation I could give you is going to be

25 10 to 15.  That's approximate.

1   Q.   And at some point, did you receive medical services?

2   A.   EMS came over and talked to me, but that was it.

3   Q.   Did you ever approach the defendant's vehicle again?

4   A.   I did, yes.

5   Q.   And was this after you were feeling better?

6   A.   Yes.

7   Q.   Will you please explain what occurred when you approached.

8   A.   I could smell the odor of marijuana emitting from the open

9   window of the car.

10  Q.   And was the window up or down?

11  A.   The window was down.

12  Q.   And as you approached the vehicle and smelled this odor of

13  marijuana, was this the closest -- or -- in comparison to your

14  first stop with Mr. Kinloch, the defendant, can you describe

15  how close you were to the vehicle?

16  A.   I was right -- standing by the door on the outside of

17  the vehicle.  That's the closest I had been during that time --

18  at that -- so far at that time.

19  Q.   And the second time you approached the vehicle, did you go

20  closer?

21  A.   Yes.

22  Q.   Officer O'Neill, did you ever pass the threshold of the

23  window?

24  A.   I did not.

25  Q.   And where is your body-worn camera located?

1   A.   It is on our chest.

2   Q.   And that was recording during this whole traffic stop?

3   A.   Yes, it was.

4   Q.   At any point, Officer O'Neill, did you put your body or

5   face into the vehicle?

6   A.   I did not.

7   Q.   As a result of this, was the vehicle then searched?

8   A.   It was.

9   Q.   And what, if anything, was found?

10  A.   I located two firearms.  One was directly under the

11  driver's seat, and then there was one in the center console in

12  direct reach of Mr. Kinloch.  There was also located a small

13  marijuana blunt which field-tested positive.  And then I was

14  informed that a plastic container containing, like, alcohol

15  res- -- or, like, a little bit of alcohol was also located

16  under the front passenger's seat.

17  Q.   And when you say you were informed of that alcoholic

18  residue, who informed you of that?

19  A.   I -- it was either Officer Bishop or Officer Lloyd.  It

20  was one of those two individuals.

21  Q.   You had mentioned that it field-tested positive.

22       So that small amount tested positive for marijuana, just

23  to clarify?

24  A.   Correct.

25  Q.   And were these items then logged in for evidence?

1  A.   Yes, they were.

2  Q.   Did you become aware at any time that Officer Bishop had

3  searched the vehicle prior to the search that you were involved

4  in?

5  A.   No.

6  Q.   And based on your observations, what did you believe about

7  Defendant Kinloch and his current state?

8  A.   He -- it may -- he was altered, possibly under the

9  influence of narcotics or alcohol or both.

10 Q.   And what is --

11          MR. WOODWARD:  I'm going to object based on

12 foundation.

13          THE COURT:  Hold on.  If you're going to be heard,

14 come forward and make your observation loudly enough.  Avoid

15 Ms. Mateo.

16          MR. WOODWARD:  Objection, Your Honor, based on

17 foundation and -- as an expert.

18          THE COURT:  All right.  Ms. Mateo, I'll hear your

19 response.

20          MS. MATEO:  He's able to answer based on his training

21 and experience as an officer.  He does not need to be an expert

22 to testify as to his observations and his conclusion regarding

23 what he observed.

24          THE COURT:  Objection is overruled.

25                  (No omissions)

1    BY MS. MATEO:

2    Q.    And you had mentioned some observations about his slurred

3    speech, but what, if anything, did you observe about his eyes?

4    A.    His pupils were dilated or small.  They were either bigger

5    or smaller.  I couldn't give you direct -- but they were not

6    natural.  They weren't normal.

7    Q.    And you said alcohol or narcotics.

8          What led you to believe that?

9    A.    The slurred speech led me towards the alcohol, but his

10   heightened state told me that -- basically from my training and

11   experience, that he might be under narcotics as well -- too.

12   Q.    And when you say "heightened state," was this during your

13   interactions with him?

14   A.    Yeah, during my interactions from -- like, from the

15   agitated part to just his indirectness towards questions and,

16   like, lack of focus.

17   Q.    At any point, was the defendant asked for a driver's

18   license?

19   A.    Yes, right before we were going to place him in handcuffs.

20   Q.    And was he able to produce a driver's license?

21   A.    He produced a wallet.  I believe there was a driver's

22   license in it, but, at that point, I wasn't able to, I believe,

23   get the license out.

24   Q.    Was any further investigation done on the vehicle of who

25   it belonged to?

1   A.   I believe it was -- it may have been belonged to a --

2   I don't know if it was a family member or friend of

3   Mr. Kinloch's.  I believe a person showed up on scene to take

4   possession of that vehicle that was a family or friend member

5   [sic] of Mr. Kinloch's.

6   Q.   And so that vehicle was never towed?  It was returned back

7   to that individual?

8   A.   Correct.  It was not towed.

9   Q.   Also, Officer O'Neill, was any further investigation done

10  on Mr. Kinloch and his criminal history?

11  A.   Yes.  Another officer -- I don't know who it was -- I

12  believe, checked and -- to see if he was a convicted felon.

13  Q.   And was he, in fact, a convicted felon?

14  A.   Yes.

15          MR. WOODWARD:  Objection as to relevance, Your Honor.

16          THE COURT:  Your response, Ms. Mateo?

17          MS. MATEO:  Yes.  It's just completing the facts

18  as to the final portion of the arrest and ultimately what was

19  found by officers during that investigation.

20          THE COURT:  Well, on the issue of suppression, I'm

21  not sure how relevant it may have been, but I did invite

22  totality of evidence as it may pertain to issues of release

23  versus detention, and his history as a felon may bear on that

24  question.  So to that extent, the objection is overruled.

25          MS. MATEO:  I have no more questions for this

24

1    witness.

2              THE COURT:  Thank you, Ms. Mateo.

3              Mr. Woodward, if you'd like to come forward to the

4    same position, your witness on cross.

5              MR. WOODWARD:  Your Honor, may I ask if I could move

6    the podium up?

7              THE COURT:  It does not move that far, Mr. --

8              MR. WOODWARD:  Oh, it does not?

9              THE COURT:  It's wired in.  So I'd suggest -- why

10   don't you step to the side -- step to the side of it and use

11   the top surface.

12                        CROSS-EXAMINATION

13   BY MR. WOODWARD:

14   Q.   Good morning, Officer O'Neill.

15   A.   Good morning.

16   Q.   First of all, I was just wondering:  Did you do -- I

17   believe there's a police report as part of this --

18   A.   Yes.

19   Q.   -- case; correct?

20        Did you do any other kind of reports other than your main

21   police report?

22   A.   No.

23   Q.   You didn't do a use of force report?

24   A.   Oh, I did do a use of force, correct.

25   Q.   You did do a use of force report?

1    A.    Yes, sir.

2              MR. WOODWARD:  Your Honor, I don't believe I received

3    that report, so I just ask that that be turned over under 26.2

4    unless it's something that I . . .

5              MS. MATEO:  One moment, Your Honor.  We're verifying.

6              THE COURT:  All right.  Thank you.

7              MS. MATEO:  Your Honor, the Government reviewed the

8    initial report.  And at this point, we see that we have one

9    police report.

10             And the use of force, would that be --

11             May I ask the witness just for clarification?

12             THE COURT:  You may.

13             MS. MATEO:  Was that a separate report?

14             THE WITNESS:  That may have been before blue team, so

15   it may just be where we clicked on the drop-down in the initial

16   report.  So it may just be the initial report with the extra

17   drop-down tabs.  Probably -- a blue team wasn't probably

18   completed, which is what we switched to later on.

19             MS. MATEO:  And is this --

20             THE COURT:  Let me interrupt, Counsel.  The issue,

21   of course, is going to be whether we have something that

22   qualifies as a statement under 26.2.

23             You can continue, Ms. Mateo.

24             MS. MATEO:  Yes.

25             So was it a statement that you wrote additionally, or

1   did you just check boxes for use of force?

2          THE WITNESS:  Checked boxes.  That was it.

3          MS. MATEO:  So your --

4          THE COURT:  Do you have access to this data,

5   Ms. Mateo?

6          MS. MATEO:  Your Honor -- and that's what I just

7   spoke about with the case agent, and she confirmed that it

8   would be the same report but she -- they would have checked

9   if it was to be used for use of force as well.  So the same

10  statement would have been used.  And we can ask the witness.

11         Did you write any additional information on that

12  second use of force report?

13         THE WITNESS:  No.

14         MS. MATEO:  We don't have a copy of a use of force

15  report.  We are -- we believe it is the same report.  It was

16  just with a check box that it was supposed to be used for use

17  of force due to the system.

18         THE COURT:  Mr. Woodward, do you have any additional

19  questions of the witness on this issue?

20  BY MR. WOODWARD:

21  Q.   Officer O'Neill, you don't think you wrote a separate

22  narrative?

23  A.   No.  It was only the box on that original report, if I --

24  like I said, I think -- what I was thinking of -- we do the

25  blue team now.  It's a separate report.  But back then, we did

1   not.  It was just a drop-down menu on that original report.

2   Q.   So what you're saying is you just marked an additional one

3   box saying that this also was a report for any use of force?

4   A.   Yes, correct.

5           MR. WOODWARD:  Your Honor, I have no further

6   questions.  Based on that, I feel comfortable proceeding.  I

7   would ask, if there is a use of force report beyond this, that

8   it be turned over at -- clearly, as soon as possible.

9           THE COURT:  To be clear, then, just for the record,

10  Defendant is withdrawing any request for the production of the

11  report, to the extent it exists, at this point under 26.2 but

12  does make a general request for its production in discovery.

13          So to that end, Ms. Mateo, whatever you have that

14  memorializes this use of force, please produce it at your

15  earliest opportunity.

16          MS. MATEO:  Yes.  And any negative finding, we will

17  send an e-mail to Defense Counsel as to what we find regarding

18  any use of force.

19          THE COURT:  Very well.

20          Proceed, Mr. Woodward.

21          MR. WOODWARD:  Thank you, Your Honor.

22  BY MR. WOODWARD:

23  Q.   You were patrolling, you said.

24      You were stopped at Jimmy DeLoach and Benton Boulevard; is

25  that correct?

28

1   A.   Yes.

2   Q.   Is that your normal patrol area?

3   A.   I was up in the Highlands that day, so it was not my

4   normal patrol area.

5   Q.   And what was your -- what were you doing that night?

6   A.   I was working in a patrol function in the Savannah

7   Highlands area.

8   Q.   Why were at that particular position?

9   A.   That's where I was assigned that day.

10  Q.   Now, you -- once you lit up your blue lights, the red car

11  pulled over immediately; right?

12  A.   Correct.

13  Q.   And Mr. Kinloch got out of the vehicle once you asked him

14  to get out; correct?

15  A.   When I asked him to get out of the vehicle, I believe so.

16  Q.   And you asked him whether he had been drinking, and he

17  told you no; correct?

18  A.   Yes.

19  Q.   At this point, he wasn't having coordination issues, was

20  he?

21  A.   Not that I'm aware of.

22  Q.   He wasn't stumbling?

23  A.   No.

24  Q.   He wasn't swaying?

25  A.   Not that I can recall.

29

Q.   Okay.  And you said that you stood back and watched some
of the field sobriety tests as they were being conducted by
Officer Bishop?

A.   Correct.

Q.   And he wasn't swaying or stumbling during that time
either; correct?

A.   I can't recall that.  I wasn't really paying attention
closely to the FST portion.

Q.   Understood.  Do you remember at one point he -- during the
test, he noticed his keys and asked you to pick them up?

A.   I don't recall.  Maybe.

Q.   Do you recall that he could not complete the test because
of a back injury?

A.   I remember him mentioning that, yes.

Q.   Do you remember if he showed the -- a scar on his back to
Officer Bishop?

A.   Yes.

Q.   And Officer Bishop stopped the test at that point; right?

A.   Not that I'm aware of.

Q.   If the test was stopped, not that you're aware of?

A.   No.

Q.   This was right before you arrested Mr. Kinloch, though;
correct?

A.   Correct.

Q.   Now, you testified on direct that you observed a red car

1    driving the wrong path of travel; correct?

2    A.   Correct.

3    Q.   But at the scene, you weren't sure you had observed that

4    car going the wrong direction; right?

5    A.   I was looking at the light, so I watched him come through

6    the intersection.  But, basically, at that point, I just waited

7    and got additional probable cause as well as just for the --

8    I wanted to make sure.  But yes, I did observe him come across

9    the intersection, you know, from the wrong lane of traffic.

10   Q.   Well, you told other officers on the scene it looked like

11   he was going in the wrong direction?

12   A.   Correct.

13   Q.   You're not sure he was going in the wrong direction;

14   right?

15   A.   He was.

16   Q.   But you told Officer Lloyd, for instance, that someone

17   was coming across like they were just coming from the opposite

18   lane?

19   A.   Yeah.

20   Q.   Did you ever lose sight of the red car?

21   A.   I did not.

22   Q.   So the red car that you had saw at Benton Boulevard was

23   the red car that you stopped?

24   A.   Correct.

25   Q.   Now, you also testified that you saw Mr. Kinloch digging

1   through the vehicle --

2   A.   Correct.

3   Q.   -- prior -- well, before you approached the car?

4   A.   Yes.

5   Q.   But you weren't sure he was digging through the vehicle;

6   right?

7   A.   I could see his hand through the back window digging

8   around, it looked like, either behind the seat or in the back

9   area of the seat area in general.

10  Q.   You told officers that he was moving around in the

11  vehicle --

12  A.   Correct.

13  Q.   -- and acting weird?

14  A.   Yes.

15  Q.   And you said he might have touched something else?

16  A.   Yes.

17  Q.   Mr. Kinloch was on the phone when you initially approached

18  the window; correct?

19  A.   Correct.

20  Q.   And you talked about slurred speech on direct?

21  A.   Yes.

22  Q.   You didn't write anything about slurred speech in your

23  report, did you?

24  A.   I can't -- without looking at it, I can't tell you exactly

25  if I did or not.

1  Q.   If I showed you your report, would that refresh your

2  recollection.  Or you have it in front of you?

3  A.   Yes.

4  Q.   Would you like to take a look at it?

5  A.   (No response.)

6  Q.   Would that -- sorry.  Would that refresh your recollection

7  of whether that put you on your --

8  A.   I can look.  If -- yeah, I can look.  I'm capable of doing

9  that, yes.

10  Q.   Well, go ahead and review the report.

11          THE COURT:  Hold on one second, Mr. Woodward.

12          Ms. Mateo, did you have an objection?

13          MS. MATEO:  Your Honor, I'm not sure if he's trying

14  to refresh his recollection or trying to impeach him in the

15  sense of whether it's in his report or not; however, the

16  officer answered he doesn't recall if it was in his report, and

17  I believe that's a sufficient answer.

18          THE COURT:  It may be.  But it may also still be an

19  effort at impeachment even if he doesn't recall.

20          So if -- Mr. Woodward, if you'd like to direct him

21  to a particular locale in the report and question him about it,

22  you're welcome to do so.

23          MR. WOODWARD:  Well, I am attempting to refresh his

24  recollection, Your Honor.

25          THE COURT:  Well, either way, if you could direct him

33

1    to a particular locale in the report and ask him about it.

2             MR. WOODWARD:  Yes, Your Honor.

3    BY MR. WOODWARD:

4    Q.   If you could take out your report, Officer O'Neill.  I'm

5    looking at Page 3 of your report.

6    A.   Okay.

7    Q.   And I'm looking at Paragraph Number 3 where you said you

8    could smell a strong odor of alcohol coming from the suspect.

9    A.   Yes.

10   Q.   At that time, you didn't reflect anything else -- any

11   other signs of impairment; correct?

12   A.   I did not, no.

13   Q.   Including slurred speech?

14   A.   Yes.

15   Q.   Thank you.

16        I want to talk a little bit about Officer Bishop's search.

17        On direct, you said that you -- you weren't aware that

18   Officer Bishop searched the car; is that right?

19   A.   Correct.

20   Q.   But, actually, he told you he was going to search the car?

21   A.   I don't recall if he did or not.

22   Q.   He said -- actually, you saw him start to search the car.

23        Do you remember that?

24   A.   I don't.

25   Q.   Okay.  Do you remember telling him, "Wait on that"?

A.   I may have said something along those lines about waiting

to search the -- about waiting to search the car, but I thought

that was in -- when we were talking.

Q.   When you were talking with who?

A.   Officer Bishop.

Q.   So you're saying that you -- you're still testifying that

you did not see him search the car, though; correct?

A.   I don't believe I did, no.

          MR. WOODWARD:  Your Honor, this is going to be a

little bit difficult because my computer is over there.

          THE COURT:  That's fine.  Tell me what you want to --

do you want to make use of the video for some purpose?

          MR. WOODWARD:  Yes, for impeachment purposes,

Your Honor.

          THE COURT:  Do you have a particular segment that you

intend to go to and show the witness, or do you want to ask

him a ques- -- tell me what you want to do mechanically.  We'll

make it work.

BY MR. WOODWARD:

Q.   Let me say this.  Officer Bishop told you that he was

going to search the car related to DUI?

A.   Yes.

Q.   Okay.  But you're saying that you weren't aware that he

did do that?

A.   I was -- I believe this was the part where I was kind of

1    sitting there kind of gassed.  I was tired and throwing up,

2    so I can't directly say whether I saw him actually go over and

3    start to do it or not.

4    Q.   But you're aware that he was going to do it?

5    A.   He said he was going to do it.

6    Q.   And you told him to wait on that?

7    A.   Yes.

8    Q.   But in any event, you're now aware that he did search the

9    car; correct?

10   A.   Now that you're telling me, yes.

11         THE COURT:  Mr. Woodward, I'm not trying to preclude

12   you from using your video in any way.  I just --

13         MR. WOODWARD:  No.  I understand.  I think I got what

14   I need, Your Honor.

15         THE COURT:  All right.  Very well.

16         MR. WOODWARD:  Thank you.

17   BY MR. WOODWARD:

18   Q.   And Officer Bishop removed two containers from the car; is

19   that correct?

20   A.   I can't speak for him on that.

21   Q.   Well, he told you that he had not found any evidence of

22   DUI after the fact?

23   A.   I don't recall that.

24   Q.   If I showed you video from your body-worn camera, would

25   that refresh your recollection?

36

1    A.    If you can show me video, absolutely.

2              MR. WOODWARD:  Is that all right, Your Honor?

3              THE COURT:  You may, Mr. Woodward.  Just for the

4    benefit of the record, Mr. Woodward, are you able to tell us at

5    all, first, whose camera this is and any time stamp you intend

6    to show us?

7              MR. WOODWARD:  Yes, Your Honor.  This is -- this is

8    Officer Bishop's body-worn camera.  It's Exhibit B to my

9    motion.  I did -- I forgot that -- I believe the Government was

10   going to make a motion to admit these exhibits into evidence

11   for this motion, sir, as well.  Hopefully, they'll enter them

12   into evidence.

13             THE COURT:  All right.

14             MR. WOODWARD:  This will be Exhibit B.

15             THE COURT:  Exhibit B to what, Mr. Woodward?

16             MR. WOODWARD:  I'm sorry?

17             THE COURT:  Exhibit B to what, Mr. Woodward?

18             MR. WOODWARD:  To the motion -- to my motion to

19   suppress evidence.

20             THE COURT:  I thought Exhibit B to your motion was a

21   sealed medical record document.

22             MR. WOODWARD:  Oh, that is for the motion for

23   release.

24             THE COURT:  That's Exhibit B to your motion for

25   release.  I'm so sorry.

1         All right.  Let me pull up your motion to suppress.

2         MS. MATEO:  Your Honor, just to make it easier,

3    because I would like to make this easier, the Government has

4    Exhibit 1, which is Officer O'Neill's, and Exhibit 2, which

5    is Officer Bishop's body-worn camera.  I believe this is what

6    Defense would like to use.

7         I am not going to be difficult.  I am happy to admit

8    these -- I guess he's stipulating -- into evidence.  They were

9    attached to Defense's motion, and the Government also referred

10   to these in their response.

11        But for clarification -- I don't know if you can hear

12   me -- of the record, we will admit them at this time so they

13   are part of this hearing.  Again, Government's Exhibit 1 is

14   Officer O'Neill's body-worn camera.  Government Exhibit 2 is

15   Officer Bishop's.  I believe that's with no objection.

16        MR. WOODWARD:  No objection.

17        THE COURT:  All right.  Very well.  Government's

18   Exhibit 1 and 2 are admitted without objection, 1 being the

19   body-worn camera of Officer O'Neill, 2 being the body-worn

20   camera of Officer Bishop.  And we can just use those

21   evidentiary numbers for what you're about to present.

22        You're about to present from Government's 2, the

23   Bishop --

24        MR. WOODWARD:  Yes, Your Honor.

25        THE COURT:   -- the Bishop body-worn camera?

1          MR. WOODWARD:  Yes, Your Honor.

2          THE COURT:  And what time stamp, Mr. Woodward?

3          MR. WOODWARD:  It's going to be time stamp 2200,

4     Your Honor.

5          THE COURT:  All right.  Very well.

6          Thank you, Ms. Mateo.

7          MS. MATEO:  Your Honor, as -- the Government would

8     object to any portion of Bishop's body-worn camera that shows

9     a shirt -- search or anything that Officer O'Neill was not

10    present at, like an officer cannot be impeached by a report by

11    another officer.  Officer O'Neill is only familiar with his

12    own facts as well as his own testimony and his own body-worn

13    camera.

14         I am not sure what Defense is going to put up, if

15    it's going to be the search or any discussions with

16    Officer O'Neill.  But for any portion of the search that

17    Officer O'Neill was not present for, we would object to any

18    questions for relevance as he was not present.

19         THE COURT:  Well, let me do this.  I have to reserve

20    ruling on that objection because I have yet to see this video.

21    I don't know what it contains.  It seemed to me it was more

22    likely to contain something that Officer O'Neill had witnessed,

23    because I think that was the thrust of the examination.

24         But, Mr. Woodward, go ahead and show your segment.

25         And, Ms. Mateo, you can renew your objection if need

1   be.

2           MS. MATEO:  Thank you, Your Honor.

3           MR. WOODWARD:  Your Honor, I'm going to play --

4   just for the record, I think it is on the -- it is Exhibit 2

5   time-stamped 2200.

6       (Video playing.)

7       (Video stopped.)

8   BY MR. WOODWARD:

9   Q.   I'm just going to pause it there.

10       Can you tell at this point whether this is your body cam,

11   Officer O'Neill?

12  A.   This is not my body cam.

13  Q.   Can you tell whose body cam it is?

14  A.   You said when you pulled it up it was Officer Bishop's.

15  Q.   Okay.

16       (Video playing.)

17  BY MR. WOODWARD:

18  Q.   (Inaudible) on it; correct?

19  A.   Yes.

20  Q.   And he said he wanted to search it incident to DUI;

21  correct?

22  A.   I believe he said something about the DUI, yeah.

23          THE COURT:  All right.  Let's hold a moment.

24          Ms. Mateo, your objection?

25          MS. MATEO:  Your Honor, as --

40

1           THE COURT:  Hold on.  Hold on.  Let's pause that
2    video.
3        (Video stopped.)
4           THE COURT:  Hold on.  Let's wait for Ms. Root.
5           THE COURT REPORTER:  Judge, I can barely hear
6    Mr. Woodward.  Everyone's getting lower and lower.
7           THE COURT:  Thank you, Ms. Root.
8           Mr. Woodward, come further forward, if you would.
9           Ms. Mateo, you were about to interpose an objection.
10   Why don't you come forward as well.
11          MS. MATEO:  Your Honor, the Government would withdraw
12   it.  We'll just use it in an argument based on the Court
13   looking at the video, and I'll make argument at a later point.
14   Thank you, Your Honor.
15          THE COURT:  Mr. Woodward, you may continue with your
16   cross-examination.
17   BY MR. WOODWARD:
18   Q.   And you had also said, Officer O'Neill, that you didn't
19   remember whether Bishop told you that he didn't find evidence
20   of DUI?
21   A.   I don't recall.
22   Q.   Would the video refresh you on that as well?
23   A.   Possibly.  I mean, whatever . . .
24          MR. WOODWARD:  It looks like time stamp 3050,
25   Your Honor.

41

1   BY MR. WOODWARD:

2   Q.   Is that you there?  I paused at 3050.

3   A.   That was me, yes.

4          THE COURT:  Mr. Woodward, hold on one second.  I

5   realize you're turning your head to deal with that.  But every

6   time you do, you're depriving our court reporter of the

7   opportunity to hear you.  You've got to be facing this way and

8   closer.

9          I'll give you all the time you need to move back and

10  forth.  We'll go as slowly as we need to.  But she has to

11  capture everything you say, so come on up, look at me, and make

12  it loud.

13         MR. WOODWARD:  Understood.

14  BY MR. WOODWARD:

15  Q.   Officer O'Neill, you can see the pause -- the still frame

16  from that video; correct?

17  A.   Correct.

18  Q.   And that is you pictured on the screen?

19  A.   Yes.

20         (Video playing.)

21         (Video stopped.)

22         MR. WOODWARD:  I'm going to go back just a little bit

23  because I think we missed it.  I'm going to go back just a

24  little bit because I think we may have missed it.

25         (Video playing.)

1          (Video stopped.)

2     BY MR. WOODWARD:

3     Q.    So he told you -- Officer Bishop told you,

4     Officer O'Neill, that he didn't find any evidence of DUI during

5     his search; correct?

6     A.    I don't know if I heard it at all.  I'm standing there,

7     but I don't know if I acknowledged it or not.  I don't know if

8     he was talking to me or who he was talking to at that time.

9     Q.    Now, speaking of whether you heard him, after this, you --

10    that's Officer Lloyd on the other side of you; correct?

11    A.    Correct.

12    Q.    Okay.  After this, you-all had a conversation about a

13    potential search; right?

14    A.    I believe so.

15    Q.    You had said on direct that you never approached the car

16    after the first time speaking with Mr. Kinloch when you removed

17    him from the vehicle; right?

18    A.    Are you talking about from removing him from the vehicle?

19    Can you clarify?

20    Q.    Let me say that again.

21          You testified on direct that you were never near the car

22    again prior to your second search -- prior to your search of

23    the vehicle?

24              MS. MATEO:  Objection, Your Honor.  I believe it was

25    his testimony that he was never near the window, the front of

43

1   the car, not the vehicle.

2           THE COURT:  I think that's my recollection as well,

3   Mr. Woodward.  You may continue.

4           Objection is -- the objection is -- well, it's not

5   even an objection.  It just sort of a comment.  To the extent

6   it mischaracterizes the testimony, the objection is sustained.

7           Continue, Mr. Woodward.

8   BY MR. WOODWARD:

9   Q.  Well, fair to say, prior to your search, you were outside

10  of the car; correct?

11  A.  In this video right here, yes.

12  Q.  And fair to say that you're quite close to the open

13  window; correct?

14  A.  Right there, yes.

15  Q.  And after this, you and Officer Lloyd and Officer Bishop

16  have a conversation about the legality of the search; correct?

17  A.  We talked about the search, yes.

18  Q.  And Officer Lloyd was concerned about the legality of the

19  search; right?

20  A.  I can't speak on what Officer Lloyd thought.

21  Q.  Well, he told you he wanted to make sure you weren't going

22  to have any legal issues; right?

23  A.  He may have said -- I can't -- like I said, I can't recall

24  exactly what Officer Lloyd said.

25  Q.  What is Officer Lloyd's position with the department?

1    A.    Officer Lloyd works with the Crime Suppression Unit -- the

2    Northwest Crime Suppression Unit.

3    Q.    What is that?  What is the Crime Suppression Unit?

4    A.    It's a proactive policing unit out of the Northwest

5    Precinct.

6    Q.    What does that mean, "proactive policing unit"?

7    A.    They do a little bit of everything from traffic stops to

8    supporting the patrol.  I can't give you -- like, I mean, they

9    go out there and -- they're proactive, I guess you'd say.  They

10   go out and look for stuff as opposed to responding to calls.

11   That would be the best way to put it.

12   Q.    One of the things they do is look for potential illegal

13   searches, that kind of thing?

14   A.    Illegal searches?  What do you mean by that?

15   Q.    Well, Officer Lloyd wanted to make sure that there weren't

16   going to be any suppression issues; right?

17   A.    I believe so.

18   Q.    Now, after this conversation with Officer Lloyd -- well,

19   let me go back a little bit further.

20        So do you remember how long this conversation outside the

21   window took place?

22   A.    No.

23   Q.    But it was after that that they knew -- then you have --

24   then you're claiming that you smelled an odor of marijuana;

25   correct?

45

A.    Correct.

Q.    And in your report, you wrote that it was a strong odor of marijuana; correct?

A.    Correct.

Q.    But you didn't smell it -- an odor when you approached the car initially; correct?

A.    Not that I'm aware of.

Q.    You didn't smell it when Mr. Kinloch first rolled down his window?

A.    I was standing at the back of the car.

Q.    Well, you eventually removed Mr. Kinloch from the car; right?

A.    I did.  And at that point, I was focused on officer safety, so I can't remember if I smelled it or not in that moment.

Q.    Well, you would remember if you smelled marijuana at that moment; right?

A.    No.  Like I said, I was focused on getting him out of the car, so I can't say whether I smelled it at that moment or not. I was focused on what I was doing at the time, which was making sure there wasn't any weapons and getting him from the vehicle, removed.

Q.    What about when he was speaking to you after that?  Do you remember smelling an odor of marijuana?

A.    Not at that time, no.

1   Q.   Nowhere in your report did you say that you smelled a

2   strong odor of marijuana prior to -- right before your search;

3   right?

4   A.   Not that I recall, no.

5   Q.   And Bishop -- Officer Bishop never told you that he

6   smelled an odor of marijuana after he searched the car, did he?

7   A.   I don't recall that.

8   Q.   And you didn't smell it during this conversation with

9   Officer Lloyd when you were standing outside the car?

10          MS. MATEO:  Your Honor, objection.  I'm going to

11  object to calling it a conversation.  The Government's going

12  to object.  As Officer O'Neill has said, he doesn't know if

13  he was talking to him.  The body-worn camera showed that they

14  were a few feet apart.  So I'm going to object to the word

15  "conversation" because Officer O'Neill testified that he

16  doesn't know if he was talking to him.

17          THE COURT:  Mr. Woodward, would you like to

18  recharacterize your question, perhaps?

19          MR. WOODWARD:  I'll ask an additional question.

20  BY MR. WOODWARD:

21  Q.   Officer O'Neill, do you remember if you were having a

22  conversation with Officer Lloyd?

23  A.   I'm standing next to him.  I can't recall.  I'm assuming

24  we did have a conversation, but I don't know about what or --

25  Q.   Would it help you to remember if I played the video from

47

1    here?

2    A.    That's up to you, sir.

3    Q.    Would it help you remember?

4    A.    It could.

5          MR. WOODWARD:  Your Honor, may I play the video?

6          THE COURT:  Ms. Mateo, do you have an objection?

7          MS. MATEO:  It's not an -- I believe -- well, yes, he

8    can play the video.

9          THE COURT:  I can't think of any reason he can't.

10         So go ahead, Mr. Woodward.

11       (Video playing.)

12       (Video stopped.)

13   BY MR. WOODWARD:

14   Q.    Fair to say you were having a conversation right outside

15   the car; correct?

16   A.    Yes.

17   Q.    And you didn't smell an odor of marijuana at that time;

18   right?

19   A.    I don't know at that point what I had smelled or didn't

20   smell at that point.

21   Q.    You don't know whether you were smelling an odor of

22   marijuana while you were talking about the legality of this

23   search?

24   A.    I don't know what -- at what point this is in the stop.

25   Like, I can't directly point where this is at with this --

1    where is it, like, in the body camera footage?  I'm guessing

2    this is after -- I don't know if this is after I've already

3    said I smell it or not.  I don't know the context to -- like, I

4    know this is where you're at in the video, but I don't know --

5    I can't directly say where I'm at at this point in this stop.

6    Q.   You don't remember if you searched the vehicle before or

7    after this conversation?

8    A.   It's hard for me to find the context of where we are right

9    now, to be honest.

10            MR. WOODWARD:  One moment, Your Honor.

11            MS. MATEO:  Can we get a time stamp for the record,

12   please.

13            MR. WOODWARD:  Time stamp at the current pause is

14   3111, Your Honor.  I believe it's played through -- starting at

15   3050.

16   BY MR. WOODWARD:

17   Q.   So you don't remember whether the -- your search occurred

18   after this point; correct?

19   A.   I -- like I said, with -- where -- in the video, I don't

20   know exactly where we are, so I'm having trouble with the

21   context of if we had done something before or after just

22   because of where we've gone to in the video.  I don't know the

23   exact -- I don't remember the exact video of -- you know what

24   I'm saying?  Like, I can't say where I'm actually at right here

25   in this video, like, just the contextwise.

49

1   Q.   Let me ask you this:  Do you remember -- no one else told

2   you that they smelled marijuana prior to searching -- or prior

3   to you smelling the odor of marijuana; correct?

4   A.   Not that I'm aware of.

5   Q.   And if you smelled marijuana prior to when you claim that

6   you smelled it through the window, you would have wrote that in

7   your report or something; right?

8   A.   For -- can you say that again real quick so I . . .

9   Q.   I'm just -- I guess what I'm trying to get at is I can't

10  tell whether you're saying you didn't smell marijuana.

11  A.   So off the initial, when I was at the back at the car and

12  when I pulled him out, I don't recall if I smelled marijuana or

13  not at that point.  I was focused on getting Mr. Kinloch out of

14  the car.  I do remember smelling it at a later point, correct.

15  Q.   You can't remember whether you smelled it?

16  A.   I remember that I smelled it at a point, yes.  I did smell

17  marijuana emitting from the vehicle at a point, but I don't --

18  I believe it was when I was standing next to the vehicle, not

19  off the initial.  If you're referring to the initial, I don't

20  remember if I did or not.  But I remember smelling it when I

21  was close to that car.  I did smell marijuana emitting from

22  that vehicle.

23  Q.   Let me just put it this way.

24       You're conducting a DUI investigation here; right?

25  A.   Officer Bishop is doing the DUI portion, correct.

50

1  Q.   Correct.  But you're the one who stopped this car?

2  A.   Correct.

3  Q.   You're interacting with Mr. Kinloch?

4  A.   Yes.

5  Q.   And you're saying you wouldn't have remembered whether you

6  smelled marijuana on him while he was talking to you?

7  A.   During the initial portion -- or what do you mean?  Like,

8  on him -- on his person or . . .

9  Q.   Yes.  You just --

10 A.   I remember smelling --

11 Q.   -- said you cannot remember --

12        THE COURT:  Hold on, gentlemen.  One at a time --

13        THE WITNESS:  I apologize.

14        THE COURT:  -- question and answer.

15        Mr. Woodward, ask your question.

16        And, Officer O'Neill, please speak up with your

17 answers a little bit more.

18        THE WITNESS:  Yes, Your Honor.

19 BY MR. WOODWARD:

20 Q.   Let me just say this:  You didn't smell marijuana prior

21 to when you claimed you did when you approached the window;

22 correct?

23 A.   Yes, that's correct.

24 Q.   And no one else on the scene reported smelling marijuana

25 prior to you claiming that you smelled marijuana?

51

1    A.    Not that I'm aware of.

2    Q.    Now, you testified that you didn't lean inside the

3    vehicle; right?

4    A.    Correct.

5    Q.    But your head did go inside the window --

6    A.    No.

7    Q.    -- to smell; correct?

8    A.    No.

9    Q.    Now, you said that your body camera is on your chest;

10   right?

11   A.    Correct.

12   Q.    But it was actually at your stomach area; isn't that

13   right?

14   A.    It was in my midsection. I can't say whether it's

15   directly -- it sits about center of my body, so --

16   Q.    Do you mind standing and showing the Court where your body

17   camera was.

18   A.    I believe about center, so --

19           THE COURT:  Would you face me, please.

20           THE WITNESS:  Yes, Your Honor.  About --

21           THE COURT:  Thank you.

22           THE WITNESS:  -- center.

23           MS. MATEO:  For the record, the witness is showing to

24   about the sternum of his chest above the abdomen.  I don't know

25   if there's any objection to that description for the record.

1           THE COURT:  You beat me to it, Ms. Mateo.  That's

2    where I was going next.

3           MR. WOODWARD:  I was going to say I would

4    characterize it as underneath the sternum, Your Honor, more in

5    the abdominal -- upper abdominal region.

6           THE COURT:  Yeah.  It's in the epigastric area.

7           You can proceed.

8    BY MR. WOODWARD:

9    Q.   And how tall are you, Officer?

10   A.   Approximately six-two to six-three.

11   Q.   So if your body camera is pointed toward the ground, fair

12   to say your head is a good 3 feet in front of where the body

13   camera would be; correct?

14   A.   I can't -- I don't know if 3 feet -- I don't -- I can't

15   speculate on how far ahead -- the camera does push forward with

16   the shirt because it's attached to the shirt, so the camera

17   will go farther forward, but I was not -- I don't believe

18   3 feet is an accurate estimate.

19   Q.   So you're saying that you -- your head did not go inside

20   the vehicle?

21   A.   Correct.

22          MR. WOODWARD:  Your Honor, may I step back to play

23   from the video?

24          THE COURT:  You may.

25          MR. WOODWARD:  This is going to be from Exhibit 1,

1   Officer O'Neill's body camera, at 4139.

2          (Video playing.)

3          (Video stopped.)

4              MR. WOODWARD:   I apologize, Your Honor.   That was the

5   wrong time stamp.   It's going to be 4055.

6          (Video playing.)

7          (Video stopped.)

8   BY MR. WOODWARD:

9   Q.   I'm going to pause it there briefly.

10         Officer O'Neill, that's Officer Lloyd on the other side of

11  the vehicle; correct?

12  A.   Correct.

13  Q.   And this is your body cam; correct?  Can you tell that?

14  A.   From what you've pulled up, it said it was my body camera,

15  correct.   This is -- would be my body camera.

16         (Video playing.)

17         (Video stopped.)

18  BY MR. WOODWARD:

19  Q.   I'm going to pause it there at 4058.

20         That's you leaned over --

21  A.   Correct.

22  Q.   -- the car; correct?

23         And you're directly next to the side of the car; correct?

24  A.   Correct.

25  Q.   And your body camera is pointed directly down at your

54

1   feet; correct?

2   A.   Close to, yes.

3   Q.   And it's your testimony that your head is not inside the

4   car?

5   A.   No.  I don't break the threshold, which is like the window

6   area, to smell.  So when you lean forward, it's attached to

7   your shirt.  I can show you here.  It goes like this, which the

8   camera will slide down, which is why, when I search a car,

9   a lot of times, it's looking down lower than where I'm actually

10  looking.

11  Q.   It's very possible that you did go into the car, though;

12  correct?

13  A.   I did not put my head in that car.

14  Q.   Immediately after this, you asked -- well, first, you

15  asked Officer Lloyd to see if he could smell it; right?

16  A.   Correct.

17  Q.   He declined to do so; correct?

18  A.   Yes.

19  Q.   Then you asked Officer Bishop to smell; correct?

20  A.   Yes.

21  Q.   And you told him, "Just give it a smell.  That way, we

22  have PC to search"; right?

23  A.   I told him to confirm my suspicion that I could smell

24  marijuana.

25  Q.   You were looking for probable cause to search the vehicle;

1    correct?

2    A.    Correct.

3            MR. WOODWARD:  One moment, Your Honor.

4    BY MR. WOODWARD:

5    Q.    What was found in the car, according to you, was a

6    small -- was it the end of a blunt?

7    A.    I believe it was a piece of a blunt, correct.

8    Q.    Was it a joint, or was it a blunt?

9    A.    Blunt.

10   Q.    You didn't find that; right?

11   A.    No.

12   Q.    And you said it was field-tested?

13   A.    Correct.

14   Q.    Was it ever lab-tested?

15   A.    I don't know if it -- I don't believe it was lab-tested.

16   It was a small amount.

17   Q.    It was .3 grams; right?

18   A.    Correct.

19   Q.    And that included the paper?

20   A.    I believe so.

21   Q.    Was there a filter or anything in there?

22   A.    Not that I'm aware of.  I don't know.

23   Q.    It was Officer Lloyd who found that; correct?

24   A.    I believe so.

25   Q.    He found it behind the passenger's seat; is that right?

1   A.   I believe that's what he told me, yes.

2   Q.   In a -- in the seat pocket?

3   A.   I -- yes.  I believe that's where he said he found it.

4   Q.   Now that you've seen --

5        MR. WOODWARD:  Well, I'll retract that, Your Honor.

6   I have nothing further, Your Honor.

7        THE COURT:  Thank you, Mr. Woodward.

8        Ms. Mateo, any redirect?

9        MS. MATEO:  Yes, Your Honor.

10        THE COURT:  Let's give Mr. Woodward a chance to get

11   away from that podium, and then we'll have you come up.

12                     REDIRECT EXAMINATION

13   BY MS. MATEO:

14   Q.   Officer O'Neill, Officer Bishop is trained in sobriety

15   tests; is that correct?

16   A.   Yes.

17   Q.   Is that why he conducted it --

18   A.   Yes.

19   Q.   -- versus you?

20   A.   Yes.

21   Q.   And he made the conclusion that he had -- the defendant

22   had failed the sobriety test; correct?

23   A.   Yes.

24   Q.   At that point, put him under arrest?

25   A.   Correct.

1          MR. WOODWARD:  Your Honor, I object.  It's a little

2     late of an objection, but as far as what his determination is

3     that Officer Bishop made as to impairment, I believe that was a

4     little hearsay too far.

5          THE COURT:  Ms. Mateo.

6          MS. MATEO:  Your Honor, on cross-examination, there

7     was some questions about the sobriety test -- whether Bishop

8     stopped the sobriety test; what, if anything, he said -- so I

9     believe Defense Counsel has most definitely opened the door for

10    any hearsay and it's appropriate for Officer O'Neill to respond

11    to that.

12          THE COURT:  I don't know if opening the door gets you

13    over a hearsay objection but overruled.

14          You can continue.

15    BY MS. MATEO:

16    Q.   Also on cross, there was some questions about the

17    defendant being on the phone.

18          Was he on the phone at the time you stopped him?

19    A.   He did have his phone, correct.

20    Q.   Did a woman arrive to the scene to get the car?

21    A.   Yes.

22    Q.   Did the police ever call anyone to pick up the car?

23    A.   No.

24    Q.   Did that woman arrive on her own --

25    A.   Yes.

1   Q.   -- during the search?

2        During your tussle, did the defendant yell anything to

3   that woman?  Do you remember?

4   A.   He was yelling for her to go inside the car --

5   Q.   And do what?

6   A.   -- and get something.  I don't know what.

7   Q.   On Exhibit 2, we watched some of the body-worn camera, and

8   I believe there was a question about some conversation.  I want

9   to direct your attention to that.

10       When Bishop made the comment -- and I can replay it.  When

11  Officer Bishop made the comment about continuing the search,

12  was he talking to you or just to his body-worn camera?

13  A.   I don't know who he was talking to at that point.

14  Q.   And the body-worn camera picks up the audio of the officer

15  wearing it; is that correct?

16  A.   Correct.

17  Q.   And, in fact, someone asked you after -- have you catched

18  your breath yet; is that correct?

19  A.   Yes.

20  Q.   Was this because this was after you had been sick?

21  A.   Yes.

22  Q.   Also, there were some questions about whether or not --

23  I believe on cross it looked like he was -- the defendant was

24  in the opposite lane; is that correct?

25  A.   Yes.

59

1    Q.   Do you remember the 9-1-1 dispatch call?

2    A.   Yeah.  I just remember the aired vehicle, be on the

3    lookout for, coming through.

4    Q.   Was there any description of what that vehicle was doing?

5    A.   It was a red sports car, and it said that it was in the

6    wrong lane of travel.

7    Q.   So for it to be aired means someone called in --

8    A.   Correct.

9    Q.   -- to give those observations as well?

10   A.   Yes.

11   Q.   Here on Exhibit -- Government's Exhibit 1, the time stamp

12   is 4158.

13        This is when you smelled the marijuana at the window;

14   correct?

15   A.   Yes.

16   Q.   Is that the closest you ever approached the window in your

17   whole interaction with the defendant?

18   A.   Yes.

19        MS. MATEO:  If we can rewind to approximately 3111.

20   BY MS. MATEO:

21   Q.   There was -- before I play it, there were some questions

22   on cross regarding the conversation with Officer Lloyd, and you

23   didn't remember if it happened before or after the search; is

24   that correct?

25   A.   Correct.

60

1    Q.   Looking at 31 -- excuse me -- 3023 on Government's

2    Exhibit 1, is this Officer Lloyd and Officer Bishop?

3    A.   No.  That's -- on the left is an EMT.

4    Q.   I apologize.  I did say 31.

5              MS. MATEO:  For the record, it's Government's

6    Exhibit 1, 3423.

7    BY MS. MATEO:

8    Q.   I believe we viewed it on Bishop's body-worn camera,

9    Exhibit 2, but is this the conversation that Defense referred

10   to with Officer Lloyd regarding the search?

11   A.   Yes.

12   Q.   And, again, this is at 3421; is that correct?

13   A.   Yes.

14   Q.   So is it safe to say that these conversations happened

15   before you smelled the odor of marijuana?

16   A.   Yes.

17   Q.   At some point, did the defendant give a false name?

18   A.   I believe he did.

19   Q.   You stated that he was -- looked like he was driving on

20   the opposite side of the road, speeding.

21        And that was -- could that be a violation of reckless

22   driving?

23   A.   Yes.

24   Q.   As well as DUI; is that correct?

25   A.   Correct.

1    Q.   You also testified that he's -- the defendant struck you
2    and you tussled with the defendant; correct?
3    A.   Yes.
4    Q.   Is there any violation of law with him doing that?
5    A.   Yes, felony obstruction.
6    Q.   There was some questions about the small amount of
7    marijuana.
8         Is marijuana legal in the state of Georgia?
9    A.   No.
10   Q.   Is any quantity of marijuana legal?
11   A.   No.
12   Q.   So is that a violation of the law?
13   A.   Yes.
14   Q.   There was also testimony of an alcoholic residue in a
15   container.
16        Is that evidence of a violation of the law,
17   Officer O'Neill?
18   A.   Yes, open container law.
19   Q.   And that was found prior to your search as well; is that
20   correct?
21   A.   Yes.
22   Q.   And any observations made of the -- Defendant Kinloch were
23   made during your interactions prior to you getting sick; is
24   that correct?
25   A.   Could you repeat that real quick so I --

1  Q.   Yes.  Any observations you had -- any interactions you had

2  with the defendant were prior to you getting sick --

3  A.   Yes.

4  Q.   -- and other officers, like Mr. -- Officer Lloyd, arriving

5  to the scene; correct?

6  A.   Correct, yes.

7  Q.   When searching a vehicle for DUI, what, if anything, do

8  officers search and look for?

9  A.   Open containers.  And then if there's --

10        MR. WOODWARD:  Objection, Your Honor.

11        THE COURT:  Hold on one second.  Come on forward.

12  State the basis of your observation.

13        MR. WOODWARD:  Objection as to the founda- -- I'm

14  going to say the relevance, Your Honor.

15        THE COURT:  All right.  The question was:  What do

16  people look for when they're searching for evidence of DUI?

17        Your objection with that -- your objection is on the

18  basis of relevance; is that correct?

19        MR. WOODWARD:  Well, I guess the foundation for --

20  as to why this officer -- let me rephrase that.  This officer

21  hasn't testified that he searched on the basis of DUI, so

22  that would be the reason based on relevance, for that reason,

23  Your Honor.

24        THE COURT:  Ms. Mateo, I'll hear you in response,

25  please.

1        MS. MATEO:  May I ask a question to clarify,

2  Your Honor?

3        THE COURT:  You may.

4  BY MS. MATEO:

5  Q.   You had smelled the odor of marijuana; correct?

6  A.   Yes.

7  Q.   However, at that point, you had also observed Defendant

8  perhaps being under the influence?

9  A.   Yes.

10  Q.   When you searched, what evidence were you looking for of

11  what crimes?

12  A.   You look for the crime of, basically, possession of, like,

13  an open container of alcohol or some kind of narcotics as well

14  as being under the influence.

15        THE COURT:  Subject to that connection, the objection

16  is overruled.

17  BY MS. MATEO:

18  Q.   And you had previously testified that you could

19  not determine whether it was narcotics or alcohol that

20  Defendant Kinloch was on; correct?

21  A.   Correct.

22  Q.   There was some discussion on cross, and I believe we saw

23  some of the video regarding the reasoning of the traffic stop

24  and discussions with your superior, Officer Lloyd; is that

25  correct?

A.    Correct.

Q.    However, at that point, you don't make a legal
determination of a search; is that correct?

A.    Yes.

Q.    Was there also a cup located in the defendant's vehicle
that included -- that had ash in it?

A.    I believe so.

Q.    Do you recall Officer Bishop or yourself searching the
defendant, Mr. Kinloch?

A.    I believe Officer Bishop searched the defendant.

Q.    Are you aware -- or do you recall what, if anything, was
found?

A.    I believe he located a couple different pills.

          MR. WOODWARD:  Objection, Your Honor, just based on
personal knowledge here.

          THE COURT:  It's a hearsay objection, Ms. Mateo.

          What's your response?

          MS. MATEO:  That it is -- I'll withdraw my question.

BY MS. MATEO:

Q.    Did the investigation reveal that the defendant did not
have a valid driver's license?

A.    I don't remember, honestly.

          MS. MATEO:  No more questions, Your Honor.

          THE COURT:  All right.  Thank you, Ms. Mateo.

          Ms. Root has been transcribing for about an hour and

65

1  a half under conditions, so we're going to take a very brief

2  recess of about 5 minutes, and I'll return to the bench.

3          You can have additional examination at that point,

4  Mr. Woodward.

5          COURT SECURITY OFFICER:  All rise.

6      (A recess was taken from 11:41 a.m. to 11:48 a.m.)

7          COURT SECURITY OFFICER:  All rise.  This honorable

8  court is back in session.  Come to order and be seated.

9          THE COURT:  Mr. Woodward, come forward, and you may

10 continue with your cross.

11         Hold on one second because I don't see Ms. Root on

12 the screen.  I just want to make sure we have her.

13         Ms. Root, are you present?

14         THE COURT REPORTER:  Yes, sir, I'm here.

15         THE COURT:  All right.  Thank you so much.

16         Please proceed, Mr. Woodward.

17                      RECROSS-EXAMINATION

18 BY MR. WOODWARD:

19 Q.  I just want to clarify something here.  You just testified

20 on redirect that the alcohol -- cup that smelled like alcohol

21 was found prior to your search.

22 A.  I believe so.

23 Q.  But that was actually found during your search; right?

24 A.  I didn't find -- I -- I'm not sure --

25 Q.  Okay.

1   A.   -- so . . .

2   Q.   You and Officer Lloyd searched the car together; right?

3   A.   Correct.

4   Q.   And that's -- and you don't know if that's when the

5   alcohol was found?

6   A.   I believe he mentioned -- Officer Lloyd mentioned

7   something about alcohol then, yes.

8   Q.   Okay.  So the alcohol bottle was not found prior to your

9   search?

10  A.   No.

11  Q.   Any container with the smell of alcohol was not found

12  prior to your search?

13  A.   Not that I'm aware of, no.

14  Q.   Okay.  I just wanted to clear that up.

15       And you're having trouble recalling some of the details of

16  this event; right?

17  A.   Yes.

18  Q.   I mean, it's understandable.  It happened a while ago;

19  right?

20  A.   Yes.

21  Q.   Why -- but you remember very clearly that you didn't put

22  any part of your body into the window; correct?

23  A.   Correct.

24  Q.   Is that because of your discussions of the issue with the

25  U.S. Attorney prior to this hearing?

1  A.   NO.   That's because of -- in general, I don't put my head

2  inside of a car to smell for marijuana.   I don't break the

3  threshold of that window in any -- all of my stops.

4  Q.   In all of your stops, you try not to break the threshold

5  of the window?

6          MS. MATEO:   Objection.   Asked and answered,

7  Your Honor.

8          THE COURT:   You can answer it one final time.

9  A.   I don't break the threshold on the window, no.   I don't

10  put my head inside of the car.

11  BY MR. WOODWARD:

12  Q.   But it is possible that at least some of your body went

13  into the car this time?

14  A.   No.

15  Q.   Now, Mr. Kinloch was charged with DUI less safe, alcohol;

16  is that correct?

17  A.   Yes.

18  Q.   He wasn't charged with any other DUI related to any other

19  kind of impairment?

20  A.   Not that I'm aware of.

21  Q.   And just to clarify another thing, you had testified this

22  still frame we have on the video at 3423 from Exhibit 1, that

23  that was the conversation that you had outside the car with

24  Officer Lloyd?

25  A.   It looks to be that is one of my conversations with

1   Officer Lloyd, correct.

2   Q.   But y'all had another conversation directly next to the

3   red car; correct?

4   A.   Yes.

5   Q.   Okay.  And that was also prior to your search; correct?

6   A.   Yes.

7           MR. WOODWARD:  Nothing further.

8           THE COURT:  Thank you, Mr. Woodward.

9           Ms. Mateo, any additional questions for this witness?

10           MS. MATEO:  No, Your Honor.

11           THE COURT:  All right.  Officer O'Neill, you may step

12   down and resume your seat in the gallery.

13           THE WITNESS:  Thank you, Your Honor.

14           MS. MATEO:  Your Honor, the Government does not have

15   any more witnesses; just argument.

16           THE COURT:  All right.  Very well.

17           Mr. Woodward, any witnesses or evidence to be

18   presented by the Defense?

19           MR. WOODWARD:  No, Your Honor.

20           THE COURT:  All right.  Then I will hear argument.

21   As the Government has the burden, I'll hear from the Government

22   first.

23           MS. MATEO:  Your Honor, may I approach?

24           THE COURT:  You may.

25           MS. MATEO:  Your Honor, the Government relies, as it

1    states in its response in opposition at Docket 34, on the

2    argument set forth in that response but will supplement now

3    hearing the testimony of Officer O'Neill.

4              As it relates to the first argument made by Defendant

5    in his motion that he was not lawfully arrested, the Government

6    believes the testimony and the facts support such an arrest.

7    Defendant Kinloch was stopped due to improper lane change,

8    speeding, reckless driving, and other violations of Georgia

9    law.  That is very clear by the testimony of Officer O'Neill.

10   Given that, there was full probable cause to stop the vehicle

11   and his subsequent arrest, Your Honor.

12             The violation of state law in the driving of a

13   vehicle as described above has been found by case law to be

14   sufficient.  Again, he was driving recklessly, speeding,

15   failing to signal, improperly changing lanes, not only as

16   observed by Officer O'Neill but, as he testified, that even

17   a 9-1-1 call to explain and describe that same improper lane

18   change was aired over dispatch, meaning someone called in to

19   state to the police that they also observed that.  Also -- so

20   at that point, he could have been arrested for the offense of

21   reckless driving.

22             But then when they initiated the traffic stop,

23   Officer O'Neill then testified, also, about the observations he

24   made, the smell of alcohol, and it is -- under Georgia law, it

25   is illegal for someone to have -- or -- excuse me -- drive or

1  be in physical control of a moving vehicle under the influence

2  of alcohol that makes it less safe to drive.  But putting

3  Mr. Kinloch, the defendant, under arrest was legal, Your Honor.

4       Then, as Officer O'Neill testified, the defendant

5  resisted arrest, swung at law enforcement, combative, not

6  listening.  Officers had to deploy the taser.  In fact, Kinloch

7  knocked the taser out of the officer's hand, thus rising to

8  another offense by Defendant Kinloch.

9       He could have been placed under lawful arrest also

10  for felony obstruction, as Officer O'Neill testified, and

11  simple battery of a police -- excuse me -- peace officer and

12  resisting.  Thus, the Government has shown that this arrest was

13  legal.

14       As it relates to the search, it is well-established

15  that a traffic stop is a constitutional detention if it's

16  justified by reasonable suspicion or probable cause to believe

17  the traffic violation has occurred, and officers can then

18  search for evidence of criminal activity due to observations

19  they made by the defendant.

20       In this case, again, Officer O'Neill stated that

21  the defendant was slurring speech.  He could smell the odor of

22  alcohol on the defendant.  At this point, the officers could

23  have searched the vehicle.

24       Now, Officer O'Neill testified that he got ill.

25  There was some talk about a search by Officer Bishop.  While

Officer Bishop did not testify today, the Government will
proffer -- and the Defense is welcome to correct, but
Officer Bishop did sweep the vehicle; at that point, did not
find anything.

However, it wasn't until Officer O'Neill -- as he
testified, other officers came. He got some medical help,
drank some water. Then he conducted and continued his
investigation of the crime. While he did search marijuana, the
Government would state that he could have walked up to that car
again and searched for evidence of DUI.

THE COURT: So you said search mar- -- did you mean
smell marijuana?

MS. MATEO: Excuse me. Yes, smell marijuana. He
could have searched the vehicle for DUI in addition to the
marijuana.

At that point, based on the totality of the
circumstances, while he got sick, it is not different than
officers moving a vehicle or towing a vehicle to get into a
safer spot or stopping a search and continuing it on due to
something that happened.

Here, Officer O'Neill got physically ill. Other
officers showed up. A search then continued on moments after.
However, the probable cause is still there. All the
observations made were still observed: the improper lane
change, the smell of alcohol, the slurred speech, the pinpoint

1  pupils, the failure of the sobriety test.

2          THE COURT:  But to be clear, it's the Government's

3  position that that evidence taken in toto constituted

4  sufficient probable cause to search the car even if no

5  marijuana had ever been smelled?

6          MS. MATEO:  Correct.

7          THE COURT:  All right.  Please proceed.

8          MS. MATEO:  Then after Officer O'Neill, as he

9  testified, approached the vehicle, as noted, there were some

10 conversations near the vehicle; however, Officer O'Neill

11 testified it wasn't until he went up to the threshold of the

12 window that he could smell the odor of marijuana.

13         Then he asked Officer Bishop to come and confirm that

14 smell, which Officer Bishop did.  On top of that, marijuana was

15 found in the vehicle ultimately in addition to the firearms and

16 a blunt, meaning it had been smoked, with ash as well.

17         Thus, those -- the smell of marijuana gave probable

18 cause, and the officer's actions established that reasonable

19 belief that there would be evidence of a crime of arrest found

20 within the defendant's vehicle.  And Officer O'Neill did state,

21 even though there was some discussion, that the small amount of

22 marijuana is still illegal, to possess marijuana, and illegal

23 to smoke it and then drive.

24         So any -- and the case law has also shown that --

25 where officers are making arrests for DUI and could reasonably

1    expect to find additional evidence of DUI, such as alcohol

2    bottles, in the suspect's vehicle.  And this is in the

3    Government's response, Page 10, Your Honor, regarding that

4    case law.

5           I believe that any argument made by Defense Counsel

6    regarding any illegal search by the officer entering the

7    vehicle to smell the marijuana has been shown today.

8    Repeatedly, Officer O'Neill stated that he does not pass the

9    threshold.  He explained the body-worn camera, why it points

10   down.  Even looking at the screenshot, you could see that there

11   is still a few feet between the feet of Officer O'Neill and the

12   car in that exhibit.

13          Again, even though there was a limited break between

14   the initial search and the substantive continued search -- and

15   I call the initial search the sweep by Officer Bishop that came

16   up -- there's nothing illegal about that, and the totality of

17   the circumstances still existed: again, the defendant's erratic

18   driving, his failed sobriety test, the smell of alcohol on his

19   breath.  The officers had probable cause to search the vehicle

20   and the compartments for evidence relating to that DUI, then,

21   further, for the marijuana once that was smelled.

22          The Government will proffer during

23   Officer Bishop's -- and the Court can see in Exhibit 2

24   Officer Bishop does not open any compartments, does not open

25   the glove compartment or the trunk to do a full search of the

1   vehicle.

2          Again, the Eleventh Circuit has held that it's got

3   this valid holding that the smell of marijuana alone is a basis

4   of reasonable suspicion to further investigation of criminal

5   conduct.  As such, the Government believes not only was the

6   DUI sufficient and the observations made, as Officer O'Neill

7   explains, with the DUI and alcohol, but, also, the smell of

8   marijuana gave rise to a lawful, legal search and to the lawful

9   recovery of the firearms, Your Honor.

10          THE COURT:  All right.  Thank you, Ms. Mateo.

11          Mr. Woodward, I'll hear you in argument.

12          MR. WOODWARD:  May I approach, Your Honor?

13          THE COURT:  You may.

14          MR. WOODWARD:  Well, Your Honor, first, as far as the

15  issue the Government briefly focused on as far as Mr. Kinloch's

16  seizure being unsupported by probable cause, I'm going to rely

17  primarily on the arguments from my motion and the exhibits

18  attached to that as well.

19          We have no testimony from Officer Bishop, obviously,

20  today, who conducted the field sobrieties, but Officer O'Neill

21  did testify that he doesn't -- didn't believe Officer Bishop

22  was showing -- was stumbling, was showing physical signs of an

23  impairment, and I --

24          THE COURT:  Mr. Kinloch was not showing signs.

25          MR. WOODWARD:  Yeah.  I'm not sure how I misspoke.

1          Mr. Kinloch was not showing those signs.  Obviously,

2     he didn't -- Officer O'Neill didn't conduct these tests.  We

3     don't have testimony from Officer Bishop today.  But I would

4     just submit that there's not enough probable cause to arrest

5     here for DUI specifically, and I would rest on the arguments

6     from my motion, Your Honor.

7          As far as the multiple searches that took place

8     here, the Government attempts to justify these searches on two

9     separate grounds, I think.  In the Government's argument just

10     a second ago, they focused primarily on the automobile

11     exception -- a probable cause search based on the automobile

12     exception; however, I believe, in the Government's brief, it

13     also -- in the response -- in their response, they also

14     attempted to justify this as a -- as Officer Bishop himself

15     stated, a search incident to arrest under <u>Gant</u>.  So I'm going

16     to address those in part here.

17          The Government fails both under Number 1 and Number 2

18     here.  Number 1, it's not justified as a search incident to

19     arrest under <u>Gant</u>.  We don't have testimony today from

20     Officer Bishop, but I'll proffer as well, and the Government

21     has Exhibit 2 in evidence.

22          It's undisputed that Mr. Kinloch was arrested and

23     detained in the car; therefore, a <u>Gant</u> search can only -- is

24     only permissible if officers have a reason -- a reasonable

25     belief that there's evidence of DUI in the car.  As you heard

1    in the body cam footage, Officer Bishop simply stated on the

2    search of the car incident to arrest.

3            In the case I cited in my motion, <u>United States v.</u>

4    <u>Reagan</u>, the Court held it's not -- it was not reasonable to

5    believe that evidence of DUI inside the passenger compartment

6    of a vehicle based solely upon the nature of the charge or the

7    existence of evidence that the driver -- that the vehicle's

8    driver was intoxicated.  That's an Eastern District of

9    Tennessee case.

10           And there, the officer did not articulate any

11   particularized reason why he believed that the defendant's

12   vehicle contained evidence of DUI.  And that's the same case

13   here.  Officer Bishop simply went in and -- in fact, against

14   what Officer O'Neill said, to wait on that.

15           Now, even if Bishop's initial <u>Gant</u> search was

16   permissible, any further search cannot be justified as far as

17   any <u>Gant</u> search incident to arrest because once Bishop searched

18   the areas that he thought were suspicious, removed the cups

19   from the car and said that he didn't have any evidence of DUI,

20   this dispelled any reason to believe -- under <u>Gant</u> to believe

21   that the evidence -- or that the vehicle contained evidence of

22   DUI.

23           THE COURT:  Mr. Woodward, let me ask you a

24   question.  I recognize that it is the Defense's position that

25   Officer O'Neill's smelling of any marijuana was the product of

1  his head being placed inside the automobile.

2  But if his head was not placed inside the automobile

3  and he smelled marijuana, does that not provide him with a

4  basis to search at that point?

5  MR. WOODWARD:  Well, that's correct, Your Honor.  If

6  it's -- if the Court finds that is a credible claim and as --

7  we admitted as much in our motions here.  That's clear as far

8  as the Eleventh Circuit and other case law, that the odor or

9  marijuana does provide probable cause under the second prong --

10  or second basis I'm going to talk about as far as the

11  automobile exception.

12  However, I think there -- so moving on to that now,

13  basically, there are a couple of reasons -- well, first of all,

14  as far -- I'll just say the odor of marijuana.  We had

15  testimony here that there's this conversation that occurs right

16  outside of the vehicle, the suspect's vehicle, and it's with

17  Officer Lloyd and Officer Bishop and Officer O'Neill.  And

18  Officer Lloyd, at that point, is voicing concerns about

19  whether -- make sure they're doing a legal search.  This is

20  after Officer Bishop has already gone through the car once.

21  Now, right after that is when -- or shortly after

22  that, I should say, is when Officer O'Neill claims -- makes his

23  claim for the first time of odor of marijuana.  And this claim

24  is just simply not credible because of timing and because of a

25  number of other things.

1          O'Neill didn't report -- you know, he was kind of

2     like back and forth.  Maybe he didn't remember.  I mean, he

3     remembered odor of alcohol very clearly and wrote that in his

4     report.  Never wrote anything about odor of marijuana prior to

5     smelling it later.  Didn't report it when Mr. Kinloch opened

6     the door.  When he patted him down, couldn't remember if he

7     smelled marijuana.

8          Officer Bishop never reported smelling marijuana

9     during his first search where he went through both -- I mean,

10    I'll proffer it.  It's in Exhibit 2 where he went through both

11    the passenger and driver's side, removed cups.  Never said

12    anything about odor of marijuana at that point.

13         No one else on the scene ever said anything about

14    an odor of marijuana even though this window is open.  They're

15    having a conversation right next to it.  And prior to

16    Officer O'Neill saying, "Oh, now I smell an odor of marijuana,"

17    no one else reported that.

18         The timing is just suspect because this is right

19    after Officer Lloyd is talking about, "Oh, I'm not -- you know,

20    let's make sure we don't get this suppressed.  Let's" -- he has

21    concerns about this stuff.  Now, all of a sudden, we have this

22    strong odor of marijuana.

23         Now, they do find this small -- what's been referred

24    to as a blunt, I guess, a roach, .3 grams including the paper

25    that was in the back seat -- or in the passenger's side seat

back pocket, buried down in there.  Where Officer O'Neill is

claiming that he smelled a strong odor of marijuana is at the

threshold of the opposite side on the passenger's seat -- or --

I'm sorry -- on the driver's side.  I simply don't think that

this is credible, that he suddenly smelled this odor of

marijuana, for all those factors.

In addition, I don't find his testimony that he's

absolutely sure that he did not break the threshold credible

given all those factors and, then, also given the fact that he

had so many bad recollections about other things to do with

this stuff.

But he remembers for sure -- and Your Honor saw the

still image and, as well, has played through where the body cam

was pointing.  Now, I know the officer is trying to say his

shirt should have got -- that the body cam would get -- go

down on his shirt and change the angle of the camera, but the

Government just characterizes him being a few feet from the

car.

And I don't believe that that is accurate.  I think

it shows Officer O'Neill's feet just inches from the car, his

body cam pointed straight down at his feet.  And I just don't

believe it's credible that no part of his body was in the car

at that point.  And as I argued in my motion under

Montes-Ramos, an officer is not permitted to gain probable

cause by going into the vehicle even by a few inches.  And that

1   argument is laid out in my motion.

2          So, yes, the odor of marijuana can be the basis for a

3   probable cause search under the automobile exception, but here,

4   Officer O'Neill, I don't believe his testimony is credible as

5   far as the odor of marijuana itself, and I don't believe it's

6   credible as far as him not breaking the threshold here.

7          For both of those reasons, a search under the

8   automobile exception is unjustified in this case, as well as

9   it can't be justified under Gant as a search incident to

10  arrest.  And for those reasons, we ask the Court to suppress

11  the evidence that came as a result of the search.

12          THE COURT:  All right.  Thank you, Mr. Woodward.

13          Ms. Mateo, would the Government like a final word?

14          MS. MATEO:  Yes, Your Honor.

15          The Government just wants to reiterate there was

16  a lot of focus on the marijuana but that, again, there was an

17  arrest for DUI and for driving under the influence, smell of

18  alcohol, and there is an exception and also justification to

19  search the vehicle for evidence of the DUI.

20          But, also, any argument made about the credibility

21  of Officer O'Neill, again, the Government points the Court to

22  watch the body-worn camera or at least the still footage of the

23  bending over, seeing the distance, and also, again, that there

24  was marijuana ultimately found.

25          There was some discussion just now about where the

1     marijuana was found, but, again, we have to rely on the

2     testimony of Officer O'Neill that the defendant was seen

3     putting his hand in the back of the car, putting his hand near

4     the passenger's seat.  So there could have been movement of

5     such marijuana even though there still was ash found in the

6     car.

7              Also, any smell of alcohol that Officer O'Neill did

8     smell was when he removed him from the vehicle and walked away

9     from the vehicle with the defendant.  So any smell of alcohol,

10    again, would be in the car.  If someone smoked marijuana --

11    and I'm sure the Court is very aware through testimony in

12    suppression hearings that the smell of marijuana sometimes can

13    be smelled from outside the vehicle if someone's driving up.

14    So that smell stays there if it's been smoked.  And that's the

15    Government's argument, especially with evidence of the blunt

16    and the ash.

17             Last -- also, there was discussion about his

18    credibility.  The first time he smelled it is when he said it

19    at that point.  That's also the first time, as Officer O'Neill

20    testified, he approached the window.  All other times in his

21    testimony, he was at the back of the vehicle for officer

22    safety.  Conversations were had.

23             But, again, I would rely on the body-worn camera

24    when there's -- first, Officer O'Neill is getting ill but also

25    discussions -- "Have you caught your breath yet?"

1          And, yes, Officer Lloyd does get there as a

2    supervisor, has those discussions of the search.  But as

3    you can listen, when the Court takes that time to review

4    the body-worn camera, those discussions are, "What did you

5    observe?"  And he's trying to get the officer to articulate

6    what was observed.

7          And everything that was articulated was articulated

8    here, that he saw the improper lane change, that he saw the

9    speeding, that there was evidence of DUI, that he failed the

10   sobriety test.

11         And so those officers are not lawyers.  They may

12   have those discussions, but I would not rely on that to say

13   that there was an illegal search and they were trying to make

14   it legal.  They were having those discussions, but it's

15   consistent with the testimony today of what was observed by

16   Officer O'Neill.  He has consistently said what he observed,

17   the observations of the alcohol as well as the smell of

18   marijuana, and, again, stated he didn't pass the threshold,

19   Your Honor.

20              THE COURT:  All right.  Thank you, Counsel.

21              THE DEFENDANT:  (Indiscernible; audio distortion.)

22              THE COURT:  Yes, Mr. Kinloch.

23              THE DEFENDANT:  Your Honor, I --

24              THE COURT:  Mr. Kinloch --

25              THE DEFENDANT:  Your Honor, may I (indiscernible;

1   audio distortion)?

2          THE COURT:  Mr. Kinloch, I would advise you not to

3   speak at this point.  Your counsel is here and present.

4          THE DEFENDANT:  I would like to address the record,

5   Your Honor, if I may.

6          MR. WOODWARD:  Mr. Kinloch, may I --

7          THE DEFENDANT:  I believe -- I believe --

8          MR. WOODWARD:  Mr. Kinloch --

9          THE DEFENDANT:  I believe I have the right to --

10         THE COURT:  Mr. Kinloch --

11         MR. WOODWARD:  Mr. Kinloch --

12         THE COURT:  Hold -- Mr. Woodward, hold on.

13         Mr. Kinloch, just hold on one second.  Mr. Woodward

14  wants to say something to you.

15         THE DEFENDANT:  I'm listening.

16         MR. WOODWARD:  Mr. Kinloch, evidence is closed in

17  this hearing.  I would advise you not to speak on the record.

18  Everything that you say can be used against you, and it's also

19  recorded.  It'll be part of the permanent record and can be

20  used at a later court hearing.

21         THE DEFENDANT:  With all due respect, Mr. Woodward,

22  I totally understand that.

23         Judge, I would still like to address the record with

24  your consent, please.  Today, I've heard a lot about marijuana

25  being found in the vehicle, but I've never been charged with

1    marijuana, Your Honor.  I've never heard anything about

2    marijuana as much as I have today.

3            I've never been charged with marijuana in this case.

4    I've never heard much about marijuana until today in this case.

5    I don't know anything about -- marijuana has never been logged

6    into the evidence in my case, so I don't know about this

7    marijuana that they keep speaking about so much.

8            And I was -- if I had the opportunity, as everyone

9    else does in this case, to speak with my attorney, then I

10   would.  But due to the circumstances of the case, my only

11   opportunity to say this would be to ask the judge to allow me

12   to address the record in this way.

13           I've never been charged with marijuana.  I don't know

14   anything about any marijuana being found in that vehicle.  My

15   first time hearing about marijuana as much as I have has been

16   today.  I've heard the Government state that marijuana is

17   not -- is illegal in the state of Georgia in any way, shape,

18   form, or fashion, in any amount.

19           So in that instance, if they had found marijuana,

20   I believe I would have been charged with marijuana because

21   it's said to be illegal.  And I have never been charged with

22   marijuana, so I don't know anything about this marijuana that

23   they're claiming to have found, Judge.  I just would like to

24   put that on the record.

25           THE COURT:  You've made your statement, Mr. Kinloch.

1    It is of record.

2              Counsel, that concludes this hearing on the issue of

3    suppression.  The Court will take the defendant's motion under

4    advisement and issue a ruling in due course.

5              We do still need to proceed to the motion regarding

6    release versus detention.  It seems to me that there would be

7    no need for Ms. Root to continue to transcribe that hearing.

8              So, Ms. Root, while you are welcome to stay if you

9    would like, I don't think it would be strictly necessary.  And

10   if you want to sign off at this time, you can do so.

11             THE COURT REPORTER:  Okay, Judge.  Then I will go

12   ahead and sign off.

13             THE COURT:  All right.  Thank you, Ms. Root.

14        (Proceedings concluded at 12:16 p.m.)

15

16

17

18

19

20

21

22

23

24

25

86

1                    C E R T I F I C A T E

2

3        I, Victoria L. Root, Certified Court Reporter, in and for

4    the United States District Court for the Southern District of

5    Georgia, do hereby certify that, pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true, correct,

7    and complete transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations

10   of the Judicial Conference of the United States.

11        WITNESS MY HAND AND SEAL this 27th day of February, 2021.

12

13

14

15

16

17

18

19   _____
     VICTORIA L. ROOT, CCR B-1691
20   United States Court Reporter
     Southern District of Georgia
21   Savannah Division

22

23

24   Post Office Box 10552
     Savannah, Georgia  31412
25   (912) 650-4066