# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | CR420-082 |
| DARRYL KINLOCH, | ) ) ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDATION

The Court previously recommended that defendant Darryl Kinloch's Motion to Suppress be denied. Doc. 65. The Court vacated its Report and Recommendation (R&R) based on an issue Kinloch raised in his objection. Doc. 78; *see also* doc. 72 (Objection). As the Order vacating the R&R explained, the objection created some uncertainty concerning the R&R's analysis, but it did not establish that the analysis was deficient. *See* doc. 78 at 9-10. The Court, therefore, directed Kinloch to supplement his argument. *Id.* at 11. He complied, doc. 79, and the Government responded, doc. 80. The time for Kinloch to reply to the Government's response has passed. *See* S.D. Ga. L. Civ. R. 7.6, S.D. Ga. L. Crim. R. 1.1. His motion, as supplemented, is therefore ripe for disposition.

## I. BACKGROUND[1]

At the January 11 hearing on Kinloch's original suppression motion, the Court heard testimony from Savannah Police Department Officer Devin O'Neil.  The basic facts relevant to Kinloch's motion remain unchanged by the supplemental briefing.   As the previous R&R summarized:

> [Officer O'Neil] stated that on February 9, 2020 he observed a vehicle traveling at a high rate of speed and in the wrong lane of traffic.  After briefly following the vehicle, which continued to travel at a high rate of speed, O'Neil initiated a traffic stop.  As he was approaching the vehicle, he testified that he could see the driver, subsequently identified as Kinloch, "digging" in the passenger compartment.  O'Neil commanded Kinloch to shut off the vehicle and toss his keys out of the window.  Kinloch turned off the vehicle, but held the keys in his hand.  O'Neil approached the driver's open window and removed the keys from his hand. He ordered Kinloch out of the vehicle and conducted a brief pat down to confirm Kinloch was unarmed.
>
> O'Neil testified that, after removing Kinloch from the vehicle, he began to question him.  He testified that he could smell an odor of alcohol and that Kinloch seemed slightly disoriented and his speech was somewhat slurred.   Another officer, Officer Bishop, performed a field sobriety test.  Roughly contemporaneously, O'Neil testified that he received radio communication, *i.e.* a "be on the lookout" or "BOLO" broadcast, reporting a red sports car driving on the wrong side of the road.

---

[1]  Since the Court vacated the prior Report and Recommendation, for completeness, the Court has included those portions which are not implicated by the supplementation.  This Report and Recommendation wholly supersedes the prior version.

He responded that he believed the vehicle he stopped was the same as the subject of the broadcast.

O'Neil testified that Officer Bishop indicated that he intended to place Kinloch under arrest for driving under the influence. When the officers attempted to handcuff him, Kinloch resisted and a fight ensued. By the time Kinloch was subdued and placed in a patrol car, several other officers had arrived. Body-worn camera footage admitted at the hearing showed that Officer Bishop searched the car and removed several containers. When O'Neil approached Kinloch's vehicle again after the altercation, he smelled an odor of marijuana. He was emphatic that, when he smelled the marijuana, he never placed his head inside the car.[2] Upon a second search of the car, officers discovered the remains of a small cigar, or "blunt," that field-tested positive for marijuana and several firearms. Kinloch was subsequently placed under arrest. *See, e.g.,* doc. 27-2 at 4-5 (police report indicating charges of arrest).

Doc. 65 at 2-4.

## II. ANALYSIS

### A. Seizure and Arrest

Kinloch did not object to the prior Report and Recommendation's analysis of his initial seizure and the propriety of his arrest. *See generally* doc. 72. His original suppression motion contended that his initial arrest, which preceded the altercation with the officers, lacked

---

[2] Defense counsel closely questioned Officer O'Neil concerning the circumstances of his detection of the odor of marijuana. *See* doc. 60 at 51-54. O'Neil's testimony that he did not detect an odor of marijuana until he returned to the window after Kinloch's arrest and that he never put his head into the car was consistent and entirely credible. The body-worn camera footage, while perhaps ambiguous, was not inconsistent with O'Neil's testimony.

probable cause.  *See* doc. 27 at 4-5.  The prior R&R recommended that

the Court find the initial arrest was justified because, notwithstanding

the dispute about whether probable cause existed to arrest Kinloch for

DUI, officers had probable cause to arrest Kinloch for traffic violations.

*See* doc. 65 at 11.  Since that analysis remains unaffected by the

supplemental briefing, it is incorporated here.  As the prior R&R

explained:

> Kinloch asserts two related, but independent, arguments concerning the propriety of his arrest.  Based on the chronology, the first argument is that "Officer O'Neil lacked the reasonable suspicion necessary to remove Mr. Kinloch from the vehicle and perform a pat-down for weapons."  Doc. 27 at 5 n. [2].  He also argues that the arrest, after the conclusion of the field sobriety test but before the altercation, also lacked probable cause.  *Id.* at 4-5.  The Government argues that the initial stop was supported by O'Neil's observation of traffic violations.  *See* doc. 34 at 7.  Once lawfully stopped, it argues that Kinloch's removal from the vehicle and pat down did not violate the Fourth Amendment.  *Id.* at 8.  It also contends that Kinloch's arrest was proper based on various potential offenses, including driving under the influence.  *Id.* at 6-7.  The Government's arguments are correct.
>
> The Eleventh Circuit has explained that "a traffic stop is a constitutional detention if it is justified by reasonable suspicion under *Terry* [*v. Ohio*] or probable cause to believe a traffic violation has occurred under *Whren v. United States*, [cit.]."  *United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003).  Furthermore, "[r]easonable suspicion is determined from the totality of the circumstances and collective knowledge of the officers."  *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006).  Officer O'Neil's fully credible testimony established that he had probable cause for the stop based on his observation of

traffic violations.  As the Government's brief points out O'Neil's observations gave him probable cause to believe that the driver was driving recklessly, in violation of O.C.G.A. § 40-6-390.  Doc. 34 at 6; *see also, e.g., United States v. Woods*, 385 F. App'x 914, 916 (11th Cir. 2010) ("We have held that there is probable cause to conduct a traffic stop where an officer observes a defendant commit a non-criminal traffic violation such as speeding or making an illegal lane change.").  Thus, even though Kinloch does not expressly challenge the propriety of the initial stop, the Government has shown that it was supported by probable cause.

The Government's further argument, that once O'Neil had properly stopped Kinloch, there was no Fourth Amendment violation in directing him out of the car, is also correct.  *See* doc. 34 at 8.  It is, at this point, well-established that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6 (1977); *see also United States v. Burwell*, 763 F. App'x 840, 850 (11th Cir. 2019) ("[It] is well-settled that an officer may direct a driver to get of the car during a lawful traffic stop." (citing *Mimms*, 434 U.S. at 11 n. 6)).

The Court also agrees with the Government's contention that the pat down did not violate the Fourth Amendment.  It is worth noting, at the outset, that the parties' presentation of this argument is cursory, at best.  Kinloch's brief raises the issue only in a conclusory footnote.  *See* doc. 27 at 5 ("Counsel also submits that Officer O'Neil lacked the reasonable suspicion necessary to remove Mr. Kinloch from the vehicle and perform a pat-down for weapons." (citing *United States v. Bishop*, 940 F.3d 1242, 1249 (11th Cir. 2019)).   The Government's response, similarly, substantially brushes the issue aside.  *See* doc. 34 at 8 ("Additionally, officers are entitled to take reasonable action, such as a pat-down, based upon the circumstances to protect themselves during investigative detentions." (citing *United States v. Hastamorir*, 881 F.2d 1551, 1556-57 (11th Cir. 1989)).  The Government's authority for its characterization that safety concerns, "based upon the circumstances," however, wholly

ignores the more recent pronouncement, by a unanimous Supreme Court, that "to justify the pat down of the driver . . . during a traffic stop, 'just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.'" *United States v. Packer*, 375 F. App's 976, 979 (11th Cir. 2010) (quoting *Arizona v. Johnson*, 555 U.S. 323, 327 (2009)).

Despite its apparent mischaracterization of the law, the Government does identify several facts, even if only briefly, that it contends supported the pat down. Specifically, the basis for the pat down was O'Neil's observation of Kinloch "violat[ing] various traffic laws, refus[ing] to drop the keys to the vehicle, [and] mov[ing] around in his vehicle . . . ." Doc. 34 at 8. The Eleventh Circuit, in the case cited by Kinloch, has recognized that "refusals to comply with . . . lawful orders, coupled with peculiar movements and tense behavior while seated in the [vehicle], support a finding of reasonable suspicion." *Bishop*, 940 F.3d at 1250. The Supreme Court has noted that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Finally, the Supreme Court has recognized "that traffic stops are especially fraught with danger to police officers." *Johnson*, 555 U.S. at 330 (internal quotation marks and citation omitted)). The Court should, therefore, find that the circumstances identified by the Government, and supported by O'Neil's testimony that his observation of Kinloch's movements in the vehicle roused his suspicion of an attempt to conceal firearms or narcotics[FN1], provided reasonable suspicion to conduct the pat down. Accordingly, to the extent that he seeks to suppress evidence on the ground that his removal from the vehicle or pat down violated the Fourth Amendment, it should be denied.

Kinloch also argues that officers lacked probable cause to arrest him for driving under the influence of alcohol. *See* doc. 27 at 4. The Government refers to several offenses which might have supported Kinloch's arrest that, nevertheless, seem to miss the thrust of defendant's argument. *See* doc. 34 at 7-8. Kinloch contends that officers lacked probable cause to arrest him when

6

they started to handcuff him after the field sobriety test.  *See* doc. 27 at 4.  Conduct that occurred *after* that—such as battery upon the officers, obstruction, or providing officers with a false name—cannot retroactively provide probable cause for the arrest.[FN2]

The Government is nevertheless correct that the traffic violations alone provided sufficient probable cause to arrest Kinloch.  *See* doc. 34 at 6 ("When the officers [sic] observed Defendant Kinloch's vehicle failing to maintain a single lane, speeding at high rates and travelling in the wrong lane of traffic, they were justified in initiating the traffic stop *and ultimately arresting him for those offenses*." (emphasis added)).  An arrest is proper if there are objective facts establishing probable cause for that arrest, even if the arresting officer stated that he was arresting the defendant for another offense for which he lacked probable cause.  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (an officer's "subjective reason for making [an] arrest need not be the criminal offense as to which the known facts provide probable cause."); *Lee v. Ferraro*, 284 F.3d 1188, 1196 (11th Cir. 2002) ("[W]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest."); *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) ("[I]f the facts support probable cause to arrest for one offense, the arrest is lawful even if the officer invoked, as a basis for the arrest, a different offense as to which probable cause was lacking.").  O'Neil's credible testimony established his observation of the traffic violations, which provided sufficient probable cause for his subsequent arrest.

FN1: O'Neil also testified that Kinloch's movements could have equally indicated that he was retrieving, rather than concealing, a weapon.

FN2: Video recorded by Officer O'Neil's body-worn camera shows that, at the conclusion of the field sobriety test, Officer Bishop physically restrained Kinloch's hands, apparently attempting to handcuff him, and informed Kinloch he was "under arrest."  The

recording was admitted at the hearing as Exhibit 1.  The Court assumes, without deciding, that Kinloch was arrested, for Fourth Amendment purposes, at that point.  *See, e.g.,* 3 Wayne R. LaFave, Search & Seizure § 5.1(a) (6th ed. 2020) ("Resort to physical restraint is almost certain to result in a holding that an arrest had been made . . .").  Thus, the altercation and false name, which all occurred later, could not provide probable cause for the original arrest.

Doc. 65 at 4-11.  The additional argument concerning whether officers also had probable cause to arrest Kinloch for DUI, and the further implications of that question for the propriety of the subsequent search of Kinloch's car, are discussed below.

Accordingly, to the extent that Kinloch's original motion contends that officers violated the Fourth Amendment by either (1) removing him from his vehicle after a valid traffic stop, (2) patting him down for weapons, or (3) arresting him at the conclusion of the field sobriety test, his motion should be **DENIED**.  The Government presented sufficient evidence to show that Officer O'Neil had probable cause to believe that Kinloch had committed traffic violations.  That probable cause was sufficient to justify both the initial stop and the subsequent arrest, despite any dispute about whether officers also had probable cause to believe Kinloch was driving under the influence of an intoxicant.

Kinloch's behavior after he was stopped created reasonable suspicion sufficient to justify a pat down.

## B. Driving under the Influence and First Vehicle Search

Kinloch's objection and the parties' supplemental briefing focus principally on the question of whether officers had probable cause to believe that Kinloch was driving under the influence of alcohol, or some other intoxicant. *See generally* doc. 72 (Objection); doc. 79 (Supplemental Motion to Suppress); doc. 80 (Response to Supplemental Motion to Suppress); *see also generally* doc. 78 (Order vacating prior Report and Recommendation). The previous Report and Recommendation recommended that the Court find that Officer Bishop's initial search of Kinloch's car was proper, under the reasoning of *Arizona v. Gant*, 556 U.S. 332 (2009), because Kinloch was arrested for DUI and Bishop had a reasonable belief that evidence of that offense would be found in the car. *See* doc. 65 at 15-16, 15 n.4. Kinloch objected that such a recommendation was inconsistent with the Court's declining to determine that officers had probable cause to arrest Kinloch for DUI. *See*

doc. 72 at 2-3. The Court directed the supplemental briefing to address that contention. *See* doc. 78 at 4, 9-11.

Despite the Court's instructions, neither supplemental brief responds to the questions implicated in Kinloch's objection. The Court requested supplemental briefing on whether Officer Bishop's initial search of the car, which was the only search purportedly justified under *Gant*, was necessarily invalid in the absence of a positive determination that officers had probable cause for Kinloch's arrest on the DUI charge. *See generally* doc. 78. The briefs do not illuminate the question of how *Gant* applies in a situation where a defendant is arrested on multiple charges, and probable cause is established as to at least one of those charges, but a search is conducted based on a reasonable belief that evidence of one of the other charges will be discovered.

Kinloch's supplement argues that Officer O'Neil's *second search* of the car was not justified under *Gant*. *See* doc. 79 at 1-5. That argument is ultimately irrelevant, as there has never been any contention or determination that Officer O'Neil's search was justified incident to Kinloch's arrest. The prior Report and Recommendation found that O'Neil's search was based upon wholly separate probable cause based on

the detectable odor of marijuana in the car.  The propriety of O'Neil's search is discussed more fully below.  The Government's supplemental brief argues that Bishop's initial search was proper, under *Gant*, because officers had probable cause to arrest Kinloch for DUI and they had a reasonable belief that the vehicle contained alcohol, *i.e.* evidence of the offense of arrest.  *See* doc. 80 at 2-6.  Alternatively, the Government argues that, even if Kinloch had been arrested only on the traffic violations, the so-called "automobile exception" to the Fourth Amendment's warrant requirement justifies Bishop's search.  *See id.* at 7-9.

After considering the supplemental briefing, the Court still should not find that the Government has proven that the officers had probable cause to arrest Kinloch for DUI *at the moment of his initial seizure*.  However, as the Government contends, the altercation that occurred *after* Kinloch's initial seizure did provide probable cause for his ultimate arrest for DUI.  *See* doc. 34 at 3 ("Officers observed Kinloch's state of mind and his strength and endurance, commenting on how those observations made them believe he was under the influence of a substance."); doc. 80 at 4-5; *see also* doc. 60 at 16 (transcript of O'Neil's

testimony that, despite being tased "once or twice," Kinloch "continued to fight."). The record contains considerable evidence suggesting Kinloch's intoxication. *See* doc. 78 at 8 n. 3. The Court did not, and does not, recommend that those facts standing alone establish probable cause for Kinloch's arrest at the conclusion of the field sobriety test. However, when considered along with the circumstances of the altercation after his seizure, probable cause exists such that Bishop's initial search of the vehicle was proper either under *Gant* or under the automobile exception.

As the Court previously noted, "Kinloch's *ultimate* arrest [as distinguished from his *initial* arrest at the conclusion of the field sobriety test] . . . was based on numerous offenses, including DUI less safe. *See* doc. 78 at 4 (citing doc. 27-2 at 4-5) (emphasis added). Even if officers lacked probable cause to believe Kinloch was intoxicated at the conclusion of the field sobriety test, his assault of the officers and strenuous resistance to attempts to subdue him provided it.

As the previous Report and Recommendation explained:

> The law is well-settled that law enforcement officers who lawfully stop a motor vehicle may proceed to conduct a warrantless search of that vehicle where they have probable cause to believe that it contains evidence of criminal activity. *Carroll v. United States*, 267 U.S. 132, 153 (1925). This "automobile exception" to the Fourth Amendment "does not have

12

a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.'" *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999) (*per curiam*) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (*per curiam*)). Indeed, "'when police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody.'" *United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir. 1990) (quoting *Michigan v. Thomas*, 458 U.S. 259, 261 (1982)). Probable cause deals with probabilities, "'not hard certainties.'" *Texas v. Brown*, 460 U.S. 730, 742 (1983) (citation omitted). Nor does the level of probability impose a "more likely true than false" standard. *Id.*; *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975) (the probable cause determination "does not require the resolution of conflicting evidence that reasonable-doubt or even a preponderance standard demands"); *United States v. Garcia*, 179 F.3d 265, 268 (5th Cir. 1999) ("the requisite fair probability is something more than bare suspicion but need not reach the fifty percent mark"); *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987) (probable cause does not require a more-probable-than-not showing). Rather, probable cause requires only that the available facts permit a person of "reasonable caution" to reach the "common-sense" conclusion, *Brown*, 460 U.S. at 742, that there is a "fair probability" evidence of a crime is located in the place to be searched, *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983), *United States v. Lewis*, 2016 WL 7668450 at * 2 (S.D. Ga. Nov. 21, 2016).

Even in the absence of probable cause, however, the Supreme Court has held that it is permissible for officers to conduct a search of a vehicle incident to the arrest of its occupants where "it is *reasonable to believe* the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 351 (2009) (emphasis added). While the Court did not flesh out the reasonable-to-believe standard, a number of appellate courts have concluded that it appears to require a lesser quantum of suspicion than probable cause, *United States v. Edwards*, 769

F.3d 509, 514 (7th Cir. 2014); *United States v. Donahue*, 764 F.3d 293, 299 n. 6 (3d Cir. 2014); *United States v. Rogers*, 656 F.3d 1023, 1028 n. 5 (9th Cir. 2011), and "probably is akin to the 'reasonable suspicion' standard required to justify a *Terry* search." *United States v. Vinton*, 594 F.3d 14, 25 (D.C. Cir. 2010). Importantly, "[a] police officer's subjective reasons for a search do not control the legal justification for his actions, as long as objective circumstances justify the search." *United States v. Lanzon*, 639 F.3d 1293, 1300 (11th Cir. 2011).

Courts have held that after an arrest for driving under the influence, a search, albeit perhaps a limited search, of a vehicle for intoxicants is proper under *Gant*. *See, e.g., United States v. Grote*, 408 F. App'x 90, 91 (9th Cir. 2011) (affirming propriety of a vehicle search, under *Gant*, because "[i]t was reasonable to believe that the car might contain one or more bottles of open liquor or drugs."); *see also, e.g., Thomas v. Plummer*, 489 F. App'x 116, 121-22 (6th Cir. 2012) (discussing two approaches to *Gant*, but explaining under both that arrests for driving under the influence, officers generally have a sufficient reasonable belief to search the passenger compartment for evidence of that crime).[FN]

FN: Defendant's reliance on the Eastern District of Tennessee's analysis of *Gant's* application to a DUI arrest is plausible, if not compelling. He correctly notes that the court found that "it is not reasonable to believe that evidence of DUI is inside the passenger compartment of a vehicle based solely upon the nature of the charge or existence of evidence that the vehicle's driver is intoxicated." *United States v. Regan*, 713 F. Supp. 2d 724, 733 (E.D. Tenn. 2010). After the court decided *Regan*, however, the Sixth Circuit indicated, albeit in dicta, that under both prominent interpretations of *Gant*, arrest for DUI generally provides sufficient reason for officers to believe that evidence related to that crime will be in the car. *Thomas*, 489 F. App'x at 121-22. In the absence of binding authority on the question, the approach of the Courts of Appeals, cited above, simply carry more weight than the earlier district court opinion. The Court also notes that lower courts have also come to conclusions similar to those expressed by the Courts of Appeals. *See, e.g., United*

> *States v. Valandra*, 2011 WL 3439930, at * 4 n. 23 [(D.S.D. June
> 9, 2011)] (collecting cases).

Doc. 65 at 12-15.

By the time Bishop conducted the first vehicle search, officers had observed: Kinloch driving erratically and at an excessive speed, *see, e.g.,* doc. 60 at 9 (transcript of O'Neil's testimony that he "observed a red Camaro moving at a high pace of speed come from the wrong lane of traffic—it's a divided highway—and come in front of my vehicle at a high rate of speed across into the proper lane of traffic . . . ."); smelled alcohol on his person, *see id.* at 14 (transcript of O'Neil's testimony that, when Kinloch was removed from the vehicle, O'Neil "could smell an odor of alcohol."); doc. 27-1 at 3 (O'Neil's written report stating that he "could smell a strong odor of alcoholic beverage coming from the suspect."); believed his speech was "slurred,"[3] *see id.*; and heard a "be on the lookout"

---

[3]  Kinloch's supplemental motion states, in a footnote, that he "also contests the validity of his arrest for DUI." Doc. 79 at 4.  The basis asserted for that challenge is his contention that "[a]ll of the absence of visual signs of intoxication can be verified by examining the government's exhibits," presumably the officers' body-worn camera videos. *Id.*  Kinloch's assessment of the evidence is incorrect.  Having examined the video, it is simply not possible to determine from it whether Kinloch's pupils are dilated.  While the Court could not discern any slurred speech, Kinloch did not testify and the audio recorded by the body-worn camera is simply not sufficiently clear to positively contradict the evidence from the officers memorializing that Kinloch's speech was slurred.  In the same footnote, Kinloch asserts that he "passed the sobriety tests." Doc. 79 at 5.  Such an assertion is not consistent with the evidence of record, including evidence that Kinloch submitted.  *See, e.g.,* doc. 27-2 at 3 (Officer Bishop's

broadcast describing a car matching the description of Kinloch's allegedly driving on the wrong side of the road, *see id*. at 15. Officer Bishop's report of the field sobriety test, which Kinloch submitted with his motion, reflects Bishop's observation that "Mr. Kinloch's pupils were pinpoint," doc. 27-2 at 3, and that Kinloch was unable to complete the "walk and turn" portion of the test as instructed, *id*.[4] After those observations, Kinloch resisted arrest and assaulted both officers. Finally, Bishop's report specifically noted that "Kinloch's strength and endurance [displayed during the altercation] [were] abnormal for a person [of] his size and [were] more in line with someone under the influence of a mind[-]altering substance." *Id*. at 4. All of those facts led officers to the wholly reasonable conclusion that Kinloch was under the influence of alcohol or some other intoxicant.

---

report indicating that Kinloch failed to complete the field sobriety test according to instructions in several respects).

[4] There are a number of statements in Bishop's report that suggest that Kinloch failed the field sobriety test. *See* doc. 27-2 at 3 (noting "6 clues" in the conduct of the Horizontal Gaze Nystagmus test, that Kinloch "miss[ed] all heal [sic] to toes and stepping off line with all steps," during the walk-and-turn test, and noting "8 clues" during that test). In the absence of any positive testimony interpreting the results of the field sobriety test, the Court cannot conclude that those results alone provided probable cause.

Thus, when Kinloch was subdued in the police car, and before Bishop conducted the search for alcohol, there was probable cause to arrest Kinloch for DUI less safe.  His arrest on that charge, along with the reasonable belief that evidence of DUI may be found in an arrestee's vehicle, would justify Bishop's search under *Gant*.  The facts establishing probable cause, including the altercation, also support Bishop's search for intoxicants under the automobile exception, even if the DUI were not the charge of arrest.  Accordingly, to the extent that Kinloch's motion or supplemental motion contends that Officer Bishop's original search violated the Fourth Amendment, it should be **DENIED**.

## C. Second Vehicle Search

Kinloch's supplemental motion argues that Officer O'Neil's search of his vehicle cannot be upheld incident to Kinloch's arrest.  *See generally* doc. 79.  As discussed above, neither the Government nor the previous R&R argued or concluded that it was.  *See* doc. 34 at 12-14 (arguing that the indications of Kinloch's intoxication and Officer O'Neil's smelling the odor of marijuana from the vehicle's open window provided probable cause, under the automobile exception, for the second search), doc. 80 at 9-11 (same); *see also* doc. 65 at 16-18.  Kinloch's objection focuses, instead,

17

on whether the R&R properly supported its determination that O'Neil's testimony was credible.  *See* doc. 72 at 3-5.  The supplemental brief waves at those issues, but does not expand upon the argument.  *See* doc. 79 at 5, n. 3.

Since the Government bears the burden of establishing the propriety of Officer O'Neil's warrantless search of the car, *see, e.g., United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) ("Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution." (emphasis omitted)), and it has not argued that O'Neil's search of the vehicle was proper incident to Kinloch's arrest, the Court should not consider the merits of such an argument.  The Court should, however, find that the Government has borne its burden that O'Neil's search of the car was valid.

As the previous R&R explained regarding Officer O'Neil's search:

The Government contends that, once Officer O'Neil detected the smell of marijuana, officers had probable cause to search the vehicle under the automobile exception.  Doc. 34 at 12-13. Kinloch does not argue that detection of the smell of marijuana is insufficient to establish probable cause.  *See* doc. 37 at 2-3. Rather, he contends that the Fourth Amendment violation

occurred when, allegedly, Officer O'Neil put his head through the car's open window to detect the odor.  *Id.*

The parties' agreement that the smell of marijuana provides probable cause for a search of the vehicle is consistent with the clearly-established law in this Circuit. The Eleventh Circuit has held that detection of the odor of burnt marijuana establishes probable cause for a search or seizure.  *See Merricks v. Adkinson*, 785 F.3d 553, 560 n. 3 (11th Cir. 2015) ("[T]he smell of burnt marijuana emanating from a vehicle is sufficient probable cause to search a vehicle." (citing *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (*en banc*)); *see also United States v. Johnson*, 2007 WL 2874303, at * 3 (S.D. Ga. Sept. 26, 2007) ("it is clearly established that the recognizable smell of marijuana gives rise to probable cause supporting a warrantless search." (quotes and cite omitted)).

The issue, then, is whether a Fourth Amendment violation had already occurred when O'Neil detected the smell of marijuana.  Kinloch contends that video footage from O'Neil's body worn camera shows that he put his head into the car's open window before he announces he smelled marijuana.  *See* doc. 27 at 7.  In his testimony, however, O'Neil consistently and emphatically denied that he ever put his head into the window. Defense counsel conceded at the hearing that if the Court found that testimony credible, then the search was permissible.  The Court finds Officer O'Neil's testimony fully credible, and while the position of the camera reflected by the recording is suggestive, it is simply not sufficient to contradict that testimony.

Doc. 65 at 16-18.

Kinloch's supplemental motion reiterates his contention that

Officer O'Neil's testimony that he smelled marijuana was not credible.

*See* doc. 79 at 5 ("None of the officers smelled the odor of marijuana before

Officer O'Neil prompted them to smell the odor.  At this 'ninth hour' the

officers' support of O'Neil[ ]'s fathom [sic] odor of marijuana is incredible and not worthy of belief.").   However, as the Court previously found, Officer O'Neil's testimony that he smelled marijuana was credible, notwithstanding the doubts defendant has persistently raised.

Review of the transcript of Officer O'Neil's testimony supports the prior R&R's characterization.   Defendant's prior counsel asked O'Neil several times whether he leaned his head into the car's window before he smelled marijuana, and O'Neil denied it each time.   *See* doc. 60 at 51 (defense counsel: "But your head did go inside the window --;" O'Neil: "No."), 54 (defense counsel: "And it's your testimony that your head is not inside the car?"; O'Neil: "No. I don't break the threshold, which is like the window area to smell."), *id.* (defense counsel: "It's very possible that you did go into the car, though: correct?"; O'Neil: "I did not put my head in that car."); 66 (defense counsel: "[B]ut you remember very clearly that you didn't put any part of your body into the window; correct?"; O'Neil: "Correct."); 67 (after O'Neil testified that it is his habit to ensure he does not "break the threshold" of a car's window to smell for marijuana, defense counsel asked "[b]ut it is possible that at least some of your body went into the car this time?" and O'Neil responded, "No.").   He also

disputed defense counsel's inference concerning the relative position of the camera and his head, based on the fact the camera's position was subject to uncertain movement, given that it was attached to his shirt and not fixed to his body. *Id.* at 52, 54 (O'Neil: "So when you lean forward, it's [*i.e.*, the body-worn camera is] attached to your shirt. … It goes like this, which the camera will slide down, which is why, when I search a car, a lot of times, it's looking lower down than where I'm actually looking."). Finally, the objection's suggestion that the small amount of marijuana discovered "makes it implausible that O'Neil smelled a strong odor," doc. 72 at 4, entirely ignores that only a small amount would be left even if a considerable amount were consumed.

Although the Court appreciates defendant's skepticism arising from the timing of Officer O'Neil's detection of the marijuana and its confirmation by other officers on the scene, *see* doc. 79 at 5, his expression of that skepticism concedes that the body-worn camera video reflects other officers' confirmation of that detection. *See* doc. 34 at 4; *see also* Ex. 1 at 41:40-45 (recording of officer confirming O'Neil's detection of the odor of marijuana). The volume and consistency of the evidence of a detectable odor of marijuana overwhelms the inferential indications contradicting

it.  The closest to contradictory evidence that Kinloch points to is the fact that Officer Bishop "did not report an odor of marijuana," after his search of the car.  *See* doc. 79 at 5 n. 3.  The absence of proof, however, is not proof of absence.  Moreover, there is no absence of proof.  Officer Bishop's written report states that "a smell of marijuana was noticed coming from inside the vehicle," during his initial search.  *See* doc. 27-2 at 4.  Any inference that might be drawn from the Officer Bishop's silence regarding a smell of marijuana on the body-worn camera video is, therefore, *de minimis*.  Notwithstanding the timing of Officer O'Neil's detection of the odor, then, the Court should credit his testimony that he detected it without passing through the vehicle's window.

Based on Officer O'Neil's credible testimony and the other evidence of record, the Court should find that the detectible odor of marijuana provided officers with probable cause to search Kinloch's car, under the automobile exception.   To the extent that his original motion or

supplemental motion seeks to suppress that search, the motions should be **DENIED**.

## III.   CONCLUSION

Accordingly, Kinloch's suppression motion and supplemental suppression motion should be **DENIED**.  Docs. 27 & 79.  This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to the R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of rights on appeal.  11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*,

648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED**, this 27th day of July, 2021.

CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA